IN THE MATTER OF ROBERT L. NETCHERT, JR.,
AN ATTORNEY-AT-LAW.

Argued September 20, 1977—Decided January 23, 1979.

*Mr. John C. Givens* argued the cause for the Monmouth County Ethics Committee.

*Mr. Paul M. Hanlon* argued the cause for the Hudson County Ethics Committee.

*Mr. Harold J. Ruvoldt, Jr.* argued the cause for respondent.

PER CURIAM. This complex of disciplinary proceedings has its genesis in some fourteen separate complaints giving

rise to thirteen formal hearings before two county ethics committees[1]. Several of the complaints have been dismissed or dropped. Before us are two presentments charging respondent with unethical conduct in four separate instances.

## I

## MONMOUTH COUNTY PROCEEDINGS

The Monmouth County Ethics Committee found respondent guilty of unethical and unprofessional conduct arising out of two complaints. The first, by Josephine E. Cox, charged that on December 1, 1975 respondent issued to complainant a check in the amount of $1518.67 drawn on his trust account. The amount represented the balance of funds due complainant from a real estate transaction, those funds having been held in escrow by respondent since the closing date of October 29, 1975. The check was returned for insufficient funds, as was a second check drawn on the same account on December 29, 1975.

Respondent, who had failed to answer the complaint, testified before a hearing panel of the Committee and admitted the accuracy of the charges against him. His explanation for the insufficiency of the funds in his trust account was, as to the first bad check, that "certain other checks which were negotiated through that account * * * had failed to clear"; and, as to the second, it was issued "on the belief that I would have certain funds to make that check valid" and "[t]o make a long story short, the funds did not come through."[2]

---

[1]Because all of the ethics proceedings here involved originated prior to April 1, 1978, the effective date of *R.* 1:20 covering discipline of members of the bar, the matters herein were processed through the appropriate County Ethics Committee rather than, as is now the case, a District Ethics Committee.

[2]The Clients' Security Fund paid complainant the full amount lost by respondent's conduct. The Fund in turn has since been reimbursed by respondent's parents.

The record before the hearing panel further contained Mrs. Cox's assertion, not denied by respondent, that her efforts to communicate with respondent after notification of the first bad check were unavailing, until her husband went to Mr. Netchert's home to protest. This visit apparently resulted in the issuance of the second check, likewise bad. In addition, at the conclusion of the hearing on the Cox matter respondent assured the panel that within a week he would present the records of his trust account from October 1975 through January 1976, covering the transaction in question. He has, however, never done so.

The Committee concluded that respondent's conduct was unethical and unprofessional in the following respects: (a) he used a client's funds held in his trust account and failed to return moneys owed, in violation of *DR* 9–102(B)(4); (b) his actions involved misrepresentation to the client with respect to the trust funds, in violation of *DR* 1–102(A)(4); and his conduct adversely reflects on his fitness to practice law, in violation of *DR* 1–102(A)(6).

The second complaint before the Monmouth County Ethics Committee involved one William Hanford, who sustained personal injuries as a passenger in a two-vehicular collision in February, 1970. Hanford alleged that he was accepted as a client by respondent after meeting with him some time in 1971; that thereafter he received a carbon copy of a letter from the liability insurer of one of the drivers, dated November 15, 1971, the original of which went to Mr. Netchert, reciting an offer which had been extended about seven months previously to settle Hanford's claim for $1500 and requesting a decision thereon; that respondent advised him that no settlement should be effected until medical treatment had been completed; that thereafter he authorized respondent in writing to obtain copies of his physicians' reports; and that "in '72 sometime" he had a discussion with respondent relative to the statute of limitations (which complainant believed to be three years) running on his case and was told that "it" had already been filed and "not to worry about it." Hanford

never had a further office conference with respondent after their first meeting in 1971, and his efforts and those of his wife to reach Netchert by telephone were met with either no response or an evasive answer as to the progress of the case. Complainant testified that he had placed "at least fifty" telephone calls to Mr. Netchert's office without reply, and he produced telephone bills supporting many of those calls. When asked to summarize his complaint against respondent, Hanford said:

> Well, the complaint is I can't get in touch with him. I believe that I've lost the case, because I don't know what's going on. I don't even know if the case is still pending or not. I have no idea. I don't know — maybe he can — maybe Mr. Netchert can tell me now what is the status. You know. What is the case. Is there a case? Do I have a case or not?

Finally, complainant said that in 1975, during the course of a worker's compensation claim being prosecuted on his behalf by another attorney, one Anthony DeFino, he asked the latter to write respondent requesting that he communicate with Hanford. Mr. DeFino did so but received no response.

Respondent, who, as with the Cox complaint, had failed to file any answer, at first appeared to concede the essential elements of the charge. As the proceedings before the hearing panel of the Committee developed, however, he took the position that Hanford had been referred to him by an attorney with whom he was at the time sharing office space; that he had never met with complainant and had spoken with him only once or twice by telephone; that while "an offer was made by the insurance company" and "certain medical records" were furnished to his office, he nevertheless did not represent Hanford; that he did discuss the case with the attorney with whom he shared space, who assured Mr. Netchert that the complainant was being sent to DeFino, who he understood had started suit on Hanford's behalf. Respondent specifically denied telling complainant that a suit had been instituted. He ascribed his failure to answer

any telephone calls to the inefficiency of his answering service. On cross-examination he admitted that he "probably" received the settlement offer from the insurance company and "possibly" received complainant's letter regarding physicians' reports.

The Committee found Hanford's version credible and concluded that respondent's conduct was clearly unethical and unprofessional in that he knowingly failed to carry out his contract of employment in violation of *DR* 7–101(A)(2), failed to maintain proper records and to communicate with his client in violation of *DR* 1–102(A)(6), and misrepresented to his client that he had commenced suit in violation of *DR* 1–102(A)(4).

## II

## HUDSON COUNTY PROCEEDINGS

The Hudson County Ethics Committee filed a presentment dealing with four charges. It made affirmative findings of unethical conduct in two instances, but as to the two remaining charges it concluded that a violation of the disciplinary rules had not been established by the requisite standard of clear and convincing evidence. Our independent review of the record with that burden of proof in mind leads us to the same conclusion with respect to the charges of which respondent was exonerated by he Committee. Hence we address only those counts on which disciplinary infractions were found.

Those charges arose out of respondent's handling of two separate personal injury claims, one on behalf of Grace B. Harris, whose infant son, Ronald, was struck by an automobile in January, 1970, and the other on behalf of Lottie B. Harris, Grace Harris's mother, who sustained a fracture of the arm from a fall on ice in December, 1969. Both claims were referred to Mr. Netchert by one D. R., an attorney who with his son J. R. practices under the firm name of R. and

R.[3] As the Committee's presentment observes, the charges against respondent must be viewed in the context of his relationship with R. and R. and particularly with D. R., and for that reason the testimony before the hearing panel and the presentment itself focus on that relationship in elaborate detail.

We need not, however, dwell here on the particulars of the R.s' practice (in part for the reasons set forth in n. 3 *supra*) beyond the observations which follow. The firm's practice is devoted almost exclusively to negligence cases. During the period with which we are concerned, and for many years prior thereto, any claim appearing to be other than a "sure thing" was referred to other counsel. As D. R. put it in his testimony before the hearing panel,

Well, if the case was one that just couldn't be lost, in my opinion, my son worked on it and if a case had any complications — maybe had to go to trial or things like that, I haven't been to Court in 20 years and I would forward it to any other lawyer who wanted to handle the case and become the attorney.

Among those to whom cases with "complications" were forwarded was respondent. D. R. said he would make a record of the case, then turn it over to Mr. Netchert who from that point forward would act as the attorney. He testified further that there was no specific arrangement as to compensation with respondent or, for that matter, with any of the other attorneys to whom cases were referred.

Respondent, on the other hand, averred that D. R. insisted that his firm remain as attorney of record at all times and that all retainers be executed in the name of R. and R.; that

[3]We resort to the use of initials to identify these attorneys because, for reasons which are apparent in this opinion, the revelations made in these proceedings as to their conduct were such as to move the Court to order an investigation into certain aspects of their practice. That matter is presently pending before the appropriate District Ethics Committees.

on the cases handled by respondent the fee was, invariably, split on a 50–50 basis; and that all moneys paid out on R. and R. cases were disbursed at that firm's office and in the presence of D. R. Mr. Netchert further testified that early in 1972 he terminated his relationship with the R. and R. firm because he was "not content with the way [D. R.] was operating his business," particularly in that D. R. asked respondent to give him certain funds in cash, over and above the agreed 50–50 split, in order to "take care of some people who were sending him cases." As to those R. and R. matters pending when the relationship was severed, respondent said the "majority of materials * * * was in [D. R.'s] office" and was retained by him; and as to those on which respondent had files (which he described as "worksheets" and "possibly other related material"), he hand delivered them to the R. and R. office, usually leaving them at a designated place on the library table.

This "arrangement," such as it was, between R. and R. and respondent — one characterized by the Committee (generously, we believe) as "haphazard and sloppy" — is at the root of the complaints of Grace B. Harris and Lottie B. Harris; for while their claims are separate and distinct, the relevant facts pertaining to the asserted ethical violations are similar. In each case respondent allegedly undertook to represent the complainants after an initial meeting in the office of R. and R. and terminated his representation by returning their files to R. and R. In each case respondent took the position that he had never agreed to represent the complainant, and that his function was, at D. R.'s request, to do investigative or preliminary legal work on the claims. In support thereof he produced copies of retainer agreements evidencing an attorney-client relationship between R. and R. and complainants. On the other hand the Committee had before it communications from respondent, on his own office stationery, to the insurance carriers involved in which he stated that he represented the respective claimants.

Without detailing the specifics of the complaints, suffice it to say that in each instance the basis of the grievance was that the complainant was simply ignored. Information on the progress of the cases was not forthcoming. Telephone inquiries produced no satisfaction. And while the Committee did not accept the complainants' assertions that Mr. Netchert had settled their cases but had failed thereafter to forward the settlement funds (the insurance companies' files demonstrated the contrary), nevertheless it did find that in each instance respondent did in fact represent the complainant, did not return the complainant's file to R. and R., and was guilty of violating *DR* 7–101(A)(2) in that he failed to carry out a contract of employment entered into with a client and did not withdraw in a manner permitted by *DR* 2–110. More particularly, the Committee concluded that respondent violated *DR* 2–110(A)(2) by withdrawing without taking reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, and delivering to the client all papers and property to which the client was entitled.

In addition the Committee found that respondent had violated DR 2–107 by dividing his fees with R. and R. without regard to the services performed and responsibility shared by each party. The presentment contains a specific finding of the Committee that Mr. Netchert's testimony as to the fee splitting arrangement was credible and was supported by D. R.'s own records, which demonstrated that "in most cases [R. and R.] received exactly 50% of the attorney's fees collected by Mr. Netchert."

## III

## CONCLUSION

We have reviewed each of the charges and findings in the respective presentments. Each instance of ethical violation is amply supported by the record, and our own indepen-

dent review leads us in each instance to the same conclusion as was reached by the respective ethics committees.

As to the Cox and Hanford complaints, respondent's own admissions establish the violations with which he has been charged, and this by clear and convincing evidence. With respect to the Harrises' claims, respondent's defense is that he did not represent the complainants. But as the Committee observed, "[W]e do not think that Mr. Netchert, given the unusual arrangement he had with [D. R.], can hide behind the [R. and R.] retainer agreement and absolve himself from all responsibility." Whatever the niceties of the contractual arrangement may have been (and we agree with the Committee's conclusion that there was an attorney-client relationship between respondent and each of the Harrises), the undeniable fact is that the complainants — confused, vague, apparently of limited ability to perceive the nuances of professional relationships — looked upon respondent as their lawyer and could hardly have been expected to do otherwise under the circumstances. See *In re Hurd,* 69 *N. J.* 316, 319 (1976).

We are not confronted here with a single instance of aberrational conduct. Rather, what emerges is a pattern of abandonment of clients, casting adrift of professional responsibilities, neglect of practice, violations of fundamental disciplinary rules governing the practice of law, and contumacious and repeated failure to co-operate with the arm of this Court charged with the enforcement of those disciplinary rules. See *In re Netchert,* 69 *N. J.* 614 (1976). Disbarment is the only appropriate discipline under the circumstances.

Respondent's name will be stricken from the roll.

*For disbarment*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER —6.