IN THE MATTER OF WILLIAM E. RABB, AN ATTORNEY AT LAW.

Argued March 3, 1980—Decided June 17, 1980.

*Colette A. Coolbaugh,* Chief, Central Ethics Unit, argued the cause for the Disciplinary Review Board.

*Justin P. Walder* argued the cause for respondent (*Walder, Steiner & Sondak,* attorneys).

PER CURIAM.

These disciplinary proceedings arise from separate transactions involving four of respondent's clients. In June, 1975, the Middesex County Ethics Committee received the first complaint against respondent from Callie Hawkins, who was dissatisfied with Rabb's handling of her false arrest claim against a department store. In due course a statement of charges was filed against Rabb. As a result of the hearings on those charges and the report of the Committee's investigating member the Committee itself filed a second statement of charges in January, 1977 regarding Rabb's representation of Elaine Bell, likewise in connection with the department store incident, and of Elaine Bell's daughter, Kim Hawkins, in connection with an entirely unrelated incident. After further hearings the Committee filed its presentment with this Court. The third complaint and statement of charges, filed in February, 1978 by the same Committee and resulting in a Presentment to the Disciplinary

Review Board (DRB)[1], emanated from a trail judge's discovery during a settlement conference of respondent's alteration of a treating physician's report referable to one of Rabb's clients, Grace Brunt. The DRB held hearings and in due course sent its decision and recommendation to this Court.

Before discussing the charges in order, we observe that Rabb, who was admitted to the bar in 1966, was suspended from the practice of law for six months from June 13, 1977. *In re Rabb*, 73 *N.J.* 272, 281–82 (1977). An application for reinstatement after that period had elapsed was rejected by this Court because of a criminal indictment then pending against respondent. The State eventually dismissed the indictment in 1979, and the Committee in turn dismissed an ethics complaint based on that same indictment. In the meantime the Callie Hawkins-Elaine Bell-Kim Hawkins matter was first argued before this Court in May, 1978, by which time the episode involving the Brunt medical report had surfaced. We therefore withheld final disposition of the Bell-Hawkins charges pending resolution of the Brunt incident. Respondent's suspension has thus continued since 1977.[2]

# I

We address first the charges surrounding respondent's representation of Callie Hawkins, who, together with her sister-in-

---

[1]All of the matters before us originated prior to April 1, 1978, the effective date of *R.* 1:20 covering discipline of members of the bar; hence they were processed through the County Ethics Committee rather than the District Ethics Committee, as is called for by the present practice. The hearings in the Brunt incident and the Committee's findings resulting therefrom occurred after the effective date of the Rule. Therefore, that matter went to the Disciplinary Review Board and thence to this Court in view of the Board's recommendation. *R.* 1:20–4(a).

[2]We recite this history in order to account for the otherwise unseemly length of time it has taken to resolve these matters.

law, Elaine Bell, retained respondent in July, 1974. Mrs. Hawkins and Mrs. Bell executed retainer agreements on that date in connection with their claims arising out of an alleged false arrest in a discount department store. As will appear below, Mrs. Bell's daughter, Kim Hawkins, executed a retainer agreement at the same time with respect to her separate claim for personal injuries resulting from an accident which had occurred some years previously. On the occasion of this first interview the clients initially spoke with an associate in the Rabb office and thereafter briefly discussed their claims with Rabb himself. They executed the retainer agreements in respondent's presence.

Shortly thereafter respondent filed a complaint in the Union County District Court on the false arrest claims, naming Elaine Bell and Kim Hawkins as plaintiffs. Obviously he confused Kim Hawkins, who had no involvement whatsoever with the false arrest, with Callie Hawkins, in whose name suit should have been brought. As might be expected this error generated further confusion, compounded by respondent's failure to communicate significant information (for instance, the trial date) to Mrs. Hawkins even after the mistake in naming the parties had been brought to his attention. When Rabb's associate informed Mrs. Hawkins that the case had been settled (the Union County District Court records so indicated), the relationship was hardly enhanced, in view of the fact that neither Mrs. Hawkins nor Mrs. Bell had authorized any settlement.

Mrs. Hawkins' continuing efforts to talk directly with Rabb were deflected until, her frustration no longer capable of containment, she threatened to "take [respondent's] whole staff to court if he did not get on the 'phone." This offer produced the desired result in that respondent promptly took the telephone call, but it is not entirely clear what the ensuing dialogue accomplished. While it is obvious that Mrs. Hawkins expressed her displeasure with the way her case had been handled, it is equally obvious that she did not discharge her attorney.

Nevertheless, the following day, April 30, 1975, Rabb sent Mrs. Hawkins a certified letter reciting that he had been unsuccessful in obtaining any money for her. The letter informed her that she had until February 2, 1976 (the expiration date of the statute of limitations) "to seek the services of another Attorney"; and that "[a]s of this time forth" respondent considered the employment relationship terminated. At this point he had taken no steps to have Mrs. Hawkins' case restored to the trial list; nor did he deliver to his client, with the April 30 "termination notice," any pertinent papers relative to the suit. It was not until about a month later, upon receipt of Mrs. Hawkins' letter requesting her papers, that respondent sent Mrs. Hawkins an examining physician's report, together with the doctor's bill. Mrs. Hawkins was understandably nonplussed to discover that the report referred to Kim Hawkins' injuries in the entirely separate incident and that even at this late date Rabb persisted in the identification error which had spawned his troubles. Shortly thereafter Mrs. Hawkins sent a letter of complaint to the Committee.

Respondent's written response to the Committee undertook to excuse his conduct on the ground that Mrs. Hawkins' claim "was, in fact, a spurious, frivolous one, one completely without merit in that she suffered no real damages." Claiming that he "exercised [his] judgment as an officer of the Court not to reinstitute or restore the matter" because *DR* 7–102(A)(2) cautions against knowingly advancing a claim unwarranted under existing law except in a good faith effort to change the law, respondent told the Committee that Mrs. Hawkins had "acted in bad faith in initially representing * * * that she had a valid claim."

The facileness of this pretentious, self-serving justification for respondent's mishandling of claimant's affairs is underscored by the fact that after her unfortunate experience with Rabb, Mrs. Hawkins went to another attorney who instituted a new suit on the same cause of action and prosecuted it to a successful

conclusion, the jury returning a verdict of $2,000 (later compromised for $1700).

The Committee rejected respondent's assertion that he knew nothing about the dismissal of Mrs. Hawkins' case. It found him to be less than candid as a witness, and concluded that he had "deliberately failed and refused to receive and return telephone calls" of Mrs. Hawkins "because he did not choose to speak with [her] concerning the status of the case." The Committee concluded that Rabb's conduct constituted deceit and misrepresentation by nonfeasance in violation of *DR* 1-102(A)(4), that respondent improperly withdrew from employment in violation of *DR* 7-101(A), and that respondent's conduct adversely reflected upon his fitness to practice law in violation of *DR* 1-102(A)(6).

Our independent review of the record prompts us to agree with the Committee's conclusion that respondent improperly terminated the lawyer-client relationship and that his conduct adversely reflects upon his fitness to practice law. At the very least he should have taken the necessary steps to have Mrs. Hawkins' case restored to the trial list. True, the client suffered no prejudice by reason of Rabb's withdrawal, but this was due only to her own tenacity in pursuing her cause rather than to any safeguarding of her interests by Rabb. When respondent terminated the relationship precipitately and without due notice (contrary to the specific provision of the disciplinary rule), the possibility of prejudice was plainly foreseeable. Had her case not been restored or reinstituted within the remaining ten months of the statutory period, she would have been barred. Likewise, respondent's avoidance of communication with Mrs. Hawkins adversely reflected upon his fitness to practice law. See *In re Netchert*, 78 *N.J.* 445 (1979). Not only are the above derelictions established by clear and convincing evidence, but our own independent appraisal satisfies us that the record yields no other conclusion.

On the other hand we do not find the same persuasive force in the charge that respondent's conduct amounted to deceit and misrepresentation by nonfeasance in violation of DR 1–102(A)(4). While Rabb doubtless was less than candid with his client, as he was with the Committee, the evidence is not clear and convincing that his evasiveness amounted affirmatively to deceit and misrepresentation. We therefore disagree with that finding of the Committee.

## II

Much of what we have said regarding respondent's handling of the Callie Hawkins action applies as well to his treatment of Elaine Bell's claim, particularly the pattern of non-communication. In much the same fashion as he had terminated the lawyer-client relationship with Mrs. Hawkins, Rabb peremptorily aborted his association with Mrs. Bell in April, 1975, again with no forewarning and again without taking any steps to have her case restored to the active list. Mrs. Bell's case remains marked "settled" on the records of Union County District Court and the statute of limitations has run on her claim.

Respondent's position is that Mrs. Bell acquiesced in the dropping of her claim because the Welfare authorities were making inquiries into any recovery she might obtain so that they could seek reimbursement of payments made to her. He argues that therefore the case was not worth pursuing because even if she were successful, she would retain little or nothing from any recovery. On the other hand Mrs. Bell denies any knowledge of interest in her case by the Welfare authorities and insists that at no time did she tell Rabb to cease representing her or otherwise to forget about her claim. At the Committee hearing respondent was unable to produce any file on Mrs. Bell's claim, so there is no correspondence or other documentation supporting his position.

The Committee resolved this conflict adversely to respondent, pointing out that his testimony was "replete with contradictions and inconsistencies" and "[o]n the whole * * * not credi-

ble." We are led to the same conclusion from our careful canvassing of the record, and find that clear and convincing evidence established respondent's failure to represent his client zealously, *DR* 7–101(A), and his engaging in conduct adversely reflecting upon fitness to practice law, *DR* 1–102(A)(6).

### III

As we have pointed out heretofore, respondent's representation of Kim Hawkins was in connection with an entirely separate incident. This claim dated back to when the claimant was struck on the head by a fire escape when she was thirteen or fourteen years old. An attorney was retained to prosecute the mother's and daughter's claims and reached a settlement agreement with defendant for $400.00. However, when the time came to enter the necessary "friendly" judgments, Mrs. Bell refused to accept the settlement and the matter remained open. It was left that Kim Hawkins could pursue her own case upon reaching her majority, which she had achieved by the time of Rabb's first interview.[3] At that meeting respondent had Kim Hawkins execute a retainer agreement. It is clear that respondent thereby entered into a lawyer-client relationship that imposed on him certain obligations. It is equally clear that he failed to discharge those obligations. He did absolutely nothing.[4] Rabb's position before the Committee was that despite the retainer agreement, he was not to represent Kim Hawkins until she and her mother had obtained the file from the first attorney, a contingency not found in the testimony of the clients and one

---

[3] Of course the two year period of *N.J.S.A.* 2A:14–21 would not begin to run until her twenty-first birthday, or some twenty-one months after Kim Hawkins' interview with respondent. *N.J.S.A.* 9:17B–2(e).

[4] Rabb so testified. The record is silent as to how he had obtained the physician's report on Kim Hawkins which he sent to Callie Hawkins after terminating his services. See *supra* at 120.

which the Committee rejected as "incredible." As the Committee's presentment points out,

> the respondent, having executed a retainer agreement to represent Kim Hawkins in the matter, had the duty and obligation to perform the necessary investigation and to assemble the necessary information in order to process the claim. This would have included contact with [the first attorney] and obtaining the file from him.

The record further demonstrates that the client never instructed respondent to stop working on the case. He simply withdrew from his employment, again without notice and again without having taken the necessary steps to protect his client's interests. The evidence is clear and convincing that in this instance again Rabb improperly withdrew from employment in violation of DR 2–110(A)(2); failed to represent his client zealously in violation of DR 7–101(A); and was guilty of conduct adversely reflecting upon his fitness to practice law, in violation of DR 1–102(A)(6).

## IV

The final matter involves respondent's representation of Mrs. Grace Brunt, who was injured in an automobile accident on July 8, 1976 and shortly thereafter retained respondent to institute suit against the driver of the other vehicle. Among the physicians consulted by Mrs. Brunt for her injuries was Dr. Jesus C. Medina, an orthopedist, who rendered treatment for several months after the accident. Dr. Medina furnished Rabb with a medical report on a form which included a question as to whether the injuries sustained by Mrs. Brunt would result in a permanent defect. The physician answered "no" to this question. However, the copy of the doctor's report which respondent submitted to his adversary contained an alteration in that the answer to this question was changed to "yes." The alteration came to light during a settlement conference (which respondent did not attend, being under suspension at the time), whereupon

the judge participating in the conference referred the matter to the Middlesex County Ethics Committee. An ethics complaint resulted, hearings ensued, and a presentment was handed up to the Disciplinary Review Board. That body concluded respondent had committed certain ethical violations.

The DRB reviewed the proceedings before the Committee as follows:

Both Dr. Medina and Susan Muscarella, his office manager, testified before the Committee concerning procedures generally employed by the doctor in the preparation of his medical reports and particularly the Brunt report. It was made clear that they were the only two individuals involved in the preparation of medical reports from the doctor's office.

In addition to the report which Dr. Medina issued to respondent, two other reports were issued to the Maryland Casualty Company in connection with the payment of personal injury protection benefits. All reports issued by Dr. Medina concerning Mrs. Brunt contained his opinion, which he reaffirmed during the hearing, that she had not sustained permanent injury as a result of the July 1976 accident.

The three reports were the only reports issued by Dr. Medina concerning Mrs. Brunt. He did not issue any supplemental or amendatory reports. Dr. Medina testified that upon his discharge of Mrs. Brunt, it was his opinion that she had not sustained a permanent injury as a result of the subject accident.

Neither Dr. Medina nor Mrs. Muscarella had any recollection nor could they find any record that the respondent or any member of his staff had requested either an amended report or authorization to alter the March 30, 1977 report. It was their testimony that no such requests were received.

Respondent testified that when he received Dr. Medina's report, he found it to abound with misstatements. It was his opinion that the Medina report did not concur with the hospital reports, x-ray records and reports from other doctors. He states that he personally attempted to reach the doctor by telephone on several occasions but was unsuccessful. He then gave the file to Thomas Stritmatter, a lay employee of respondent, and requested Mr. Stritmatter to contact the doctor on his behalf and ask him if he would change his opinion as to the issue of permanency due to the fact that it did not appear to be a proper conclusion based on all factors involved in the case.

Several days later Mr. Stritmatter allegedly informed respondent that he had spoken to the doctor's nurse and was informed that the doctor had been unavailable. Mr. Stritmatter told him that he asked the nurse to ask the doctor if he would change his opinion and the nurse said that she would check with the

doctor and get back to Mr. Stritmatter. Mr. Stritmatter told respondent that he called the nurse several days later and was informed that the doctor would change his opinion as to permanency; that is, that the doctor authorized his report to be changed to reflect an affirmative opinion on the question pertaining to permanent injury but that the doctor would not send out any report supplemental to the initial report. After receiving the aforesaid information from Mr. Stritmatter, respondent stated that he took the report and told his secretary to change the "No" opinion to "Yes" on the issue of permanency.

Thomas Stritmatter did not testify at the hearings, as his whereabouts were unknown. However, respondent submitted affidavits of two Middlesex County attorneys, which were admitted into evidence by consent. Both affidavits stated that the affiants had spoken with Thomas Stritmatter and that he had told the affiants that he had been authorized by Dr. Medina to alter the medical report on the question pertaining to permanent injury.

Based on the testimony adduced and evidence presented at the hearings, the Committee found that neither Dr. Medina nor Mrs. Muscarella was ever requested to issue an amended report pertaining to Mrs. Brunt or authorized the report to be changed or modified in any way. Further, the Committee found respondent's testimony concerning his reasons for altering the report and his explanation that Thomas Stritmatter had advised him that the amendment had been authorized "totally unbelievable and lacking in credibility." The Committee was obviously of the view that respondent had fabricated the "Stritmatter scenario" as a defense to the charges lodged against him. They therefore found that he had engaged in unethical and unprofessional conduct in violation of DR 1–102(A)(3), (4), (5) and (6) and DR 7–102(A)(1), (2), (3), (4), (5), (7) and (8).

The DRB's review of the record led it to decide that while there was considerable evidence to support a determination that respondent had totally fabricated the "Stritmatter" defense and thus had fraudulently directed the alteration of Dr. Medina's report, such evidence did not rise to the required level of clear and convincing and hence respondent could not be found guilty of fraudulent conduct.

However, the DRB went on to conclude that even assuming Stritmatter had falsely informed respondent that he had communicated with Dr. Medina's office and that the doctor had authorized respondent to alter his medical report, nevertheless respondent was still guilty of violating DR 1–102(A)(5) and (6),

prohibiting conduct prejudicial to the administration of justice and adversely reflecting on one's fitness to practice law, and *DR* 7–102(A)(3), forbidding the concealing of or knowing failure to disclose that which an attorney is required by law to reveal. The report states:

> The Board finds it shocking that any attorney would authorize the alteration of such an important document as a medical report based solely upon the alleged facts recited in respondent's testimony. It seems obvious that under such circumstances respondent was duty bound to speak with the doctor personally and either confirm the change in writing or obtain a supplemental report from the doctor. At the very least, respondent should have submitted the doctor's original report to his adversary with a letter detailing the fact that the doctor had subsequently changed his opinion on the question of permanency, sending a copy of the letter to the doctor. This would seem mandated by R. 4:17–4(e).
>
> Such conduct constitutes not only a disservice to one's client, who in answering interrogatories must swear to the veracity of the answers and documents submitted, but is contrary to the orderly administration of justice. The events in the instant matter serve as testimony to what can occur when a lawyer employs less than an adequate standard of professionalism in his representation of a client.

Our independent survey of the record leads us to conclude that clear and convincing evidence supports the findings of the DRB, namely, that respondent violated *DR* 1–102(A)(5) and (6) and *DR* 7–102(A)(3).

## V

That brings us to the question of appropriate discipline. Respondent has demonstrated a disdain for his client's interests in the Hawkins-Bell matters, and an appalling insensitivity to the high standards of his profession in the Brunt incident. It may be, as his attorney suggests, that Rabb's inexperience was the reason he mishandled his cases and then concealed his mistakes. However, that hardly excuses the derelictions so graphically portrayed in this record, derelictions which this Court views as most serious and which have jeopardized respondent's privilege to practice law.

Under all the circumstances we believe a three-year suspension is the appropriate discipline. Rabb has been under suspension for almost exactly three years. Therefore, any application for reinstatement should be processed by the Disciplinary Review Board. Prior to reinstatement respondent is to reimburse the Administrative Office of the Courts for the cost of stenographic transcripts in these disciplinary proceedings.

So ordered.

*For suspension for three years*—Justices SULLIVAN, PASHMAN, CLIFFORD, SHREIBER and POLLOCK—5.

*Opposed*—None.

## ORDER

It is ORDERED that WILLIAM E. RABB of Metuchen be suspended from the practice of law for three years and until the further order of the Court, effective June 13, 1977; and it is further

ORDERED that WILLIAM E. RABB be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that WILLIAM E. RABB reimburse the Administrative Office of the Courts for the cost of all stenographic transcripts in this matter; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.