IN THE MATTER OF JOHN J. WINBERRY, AN
ATTORNEY AT LAW.

January 30, 1986.

ORDER

The Disciplinary Review Board having filed a report with the
Supreme Court recommending that JOHN J. WINBERRY, of

RUTHERFORD, who was admitted to the Bar of this State in 1933, be suspended from the practice of law for two years, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and respondent is suspended from the practice of law for a period of two years, effective February 15, 1986, and until further order of the Court; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said JOHN J. WINBERRY as an attorney at law of the State of New Jersey; and it is further

ORDERED that JOHN J. WINBERRY be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys; and it is further

ORDERED that JOHN J. WINBERRY reimburse the Ethics Financial Committee for appropriate administrative costs.

### Decision and Recommendation of the
### Disciplinary Review Board

This matter is before the Board based upon two presentments filed by the District II-B (Bergen County) Ethics Committee. The facts are as follows:

### 1. JOHN J. WILLIAMS, JR.

Respondent represented John J. Williams, Jr., who qualified on November 9, 1972 as executor of the estate of his late sister, Annette W. Frank. She left a son as sole heir. Respondent did not comply with a September 9, 1974 court order requiring the executor to file an accounting within 60 days. Respondent

maintained he was trying to reach a settlement with the heir concerning an allegation that the deceased Mrs. Frank, who with her brother, Mr. Williams, had been co-executors of the estate of their late father, had misappropriated funds of the father's estate thus depriving Mr. Williams of his rightful share. Respondent and Mr. Williams felt that all of the assets in the Frank estate were in fact assets held in trust under her father's estate. Although an Order to Show Cause was issued in January 1975 to compel Mr. Williams to explain why he should not provide an accounting, neither the executor nor residents of his household would accept service. Respondent maintained that Mr. Williams was in the hospital at that time and could not be served. The hearing on the order to show cause was continued a number of times because of Respondent's alleged incapacity due to an automobile accident on May 17, 1975.

On February 27, 1975, the trial court issued an order requiring an accounting be filed within 45 days or Mr. Williams would be committed to the county jail. Respondent's motion to the Appellate Division for leave to appeal was denied on May 5, 1975. When another order to show cause was issued on April 23, 1975, Respondent, on May 8, 1975, filed a motion for a stay and leave to appeal with the Appellate Division without mentioning that an earlier motion had been denied. The Appellate Division on June 18, 1975, denied Respondent's second application for leave to appeal. On July 8, 1975, Respondent served a third motion for a stay and leave to appeal upon the county surrogate. Ultimately, an order was entered by the trial court on July 25, 1975, directing that Mr. Williams be confined in the county jail until he complied with the September 9, 1974 order to file an accounting.

On August 18, 1975, the accounting was filed. A court hearing on the accounting was scheduled for October 10, 1975. On the day before, Respondent telephoned the judge's chambers and was advised that he personally had to be present at the 9 a.m. hearing. On the day of the hearing, Respondent

telephoned the judge's chambers at 10:35 a.m., stating he would be there by 11 a.m.. At 11:40 a.m., he again telephoned the judge's chambers, but this time said he could not be there because of medical reasons. Later, on the same day, the court imposed a $250 sanction against Respondent. Respondent neither appealed the sanction, nor requested a rehearing on it. It was not paid until after the court filed a complaint against Respondent on November 3, 1975.

In his letter to the then Central Ethics unit, the trial court charged that Respondent's failure to comply with the order imposing sanctions violated *DR* 1–102(A)(5). The court also noted that there may have been a violation of *DR* 7–102(A)(1) and (B)(1) in Respondent's representation of Mr. Williams because Williams was in a conflict of interest as co-executor of his father's estate and executor of his sister's estate. Respondent filed an answer to the complaint which did not deal directly with the allegations but attempted to explain the merits of the case.

Respondent did not appear at the scheduled May 11, 1983 Ethics Committee hearing. The presenter placed on the record the substance of the complaint. No testimony was taken. The committee concluded that Respondent's conduct was clearly unethical and unprofessional because he knowingly sought to delay the conclusion of the estate and the court proceeding by not preparing and filing the required accountings. The Committee believed this was done to harass or injure Mrs. Frank's heir. It further found that Respondent's conduct helped perpetrate a fraud upon the court because Respondent was aware of the inherent conflict of his client in the two estates. The committee found that Respondent engaged in conduct prejudicial to the administration of justice by failing to attend the court hearing on October 10, 1975, and by having failed to appeal or pay the sanction.

### 2. PATTI JO SMITH

Respondent was sued by a former client, Patti Jo Smith. The action was brought to compel Respondent to turn over her bank

book to her. Respondent was directed to appear in court on April 21, 1978. He did not appear. On April 25, 1978, another superior court judge ordered him to surrender the bank book within 48 hours. He failed to comply. As a result, an order to show cause was issued to hold Respondent in contempt returnable June 23, 1978. When he did not appear, a bench warrant was issued for his arrest. The bank book was ultimately delivered to the plaintiff through the efforts of Respondent's counsel. Respondent subsequently failed to comply with a court order issued September 21, 1978, to pay plaintiff's counsel fees totalling $1,300 and court costs of $84. Another order for contempt was returnable on March 29, 1979. Again, he failed to respond. A second bench warrant was issued. After his arrest, he was brought before the court on October 9, 1980, was found in contempt of court and was directed to pay the counsel fees. Respondent did not appeal this decision and did not appear at the Ethics hearing. After the presenter placed on the record the substance of the complaint, the District Ethics Committee concluded that Respondent's conduct was unethical and unprofessional.

### 3. KUGLAN ESTATE

Respondent and Madeline Kuglan were named as co-executors and co-trustees of the estate of Charles Kuglan, who died September 9, 1966. Mr. Kuglan's will provided in part that the bulk of his estate was to be held in trust to provide a life estate and income to his wife, Madeline Kuglan. Following the death of her husband, Mrs. Kuglan moved to Florida and left all matters to be handled by Respondent. The decedent, in an informal agreement dated June 8, 1966, and witnessed only by Respondent, directed that Respondent alone would be responsible for any decisions regarding trust transactions.

The principal asset of the estate was decedent's ownership of stock in a closely held corporation. In April 1967, the corporate

stock was sold for $130,143.48 under an agreement decedent entered into in 1965 when he withdrew from business activities because of illness. Of the total amount, $33,143.48 was paid to the estate in May and June 1967. An interest-bearing promissory note was given by the corporation for the balance. This note was paid on October 12, 1979. Respondent thereafter withdrew $100,000 from the account and applied the proceeds as a loan to himself and to Elwin Realty Co., Inc., a family corporation formed in 1974. This corporation's charter was later declared void by the State on September 18, 1978 for nonpayment of franchise taxes.

Mrs. Kuglan retained another attorney in October 1980 to obtain from Respondent information concerning estate assets, such as where the funds were invested and what income benefits were due her. She told this attorney that Respondent did not disclose to her the details concerning the corporate corpus assets. She said Respondent just informed her that the money was invested and she was receiving the income. Respondent never filed a New York inheritance tax return, a federal estate tax return or a fiduciary income tax return nor did Mrs. Kuglan sign any such document. On February 20, 1981, Mrs. Kuglan filed an ethics complaint. She complained of Respondent's failure to account. She acknowledged that she was not experienced in business or financial matters, but was advised by another attorney that certain documents should have been filed. She further claimed that Respondent told her by letter that the estate only received $100,000 from her husband's business interests, but that her present attorney had obtained checks revealing Respondent received $133,143.38.

Mrs. Kuglan, by letter dated December 9, 1981, to the then Division of Ethics and Professional Services (DEPS) agreed with the accounting of estate funds that Respondent sent her and desired to withdraw her complaint. When her attorney testified before the Ethics Committee, he said he spoke with Mrs. Kuglan after she informed him she was now satisfied with

Respondent's handling of the estate. The attorney maintained that Mrs. Kuglan's statements had been based on "either direct communications she has had" with Respondent or "her own desire to avoid disputes and getting involved." While Mrs. Kuglan had initially consented to travel from Florida to testify at the District Ethics Committee hearing, she later changed her mind.

On July 10, 1981, Respondent was interviewed by DEPS. He claimed that Mrs. Kuglan was aware of and consented to the withdrawal of $100,000 in estate funds, loaned to Elwin Realty and himself. He also believed that he filed a federal estate tax return but did not have a copy of it. The federal Internal Revenue Service later informed DEPS there were no records of filings of federal estate tax returns or fiduciary tax returns. While Respondent later forwarded to DEPS the estate financial records, these records were inadequate to permit a meaningful review. The estate account as of December 31, 1980, had a balance of $761.11. Respondent failed to comply with requests from DEPS for more detailed information and records. From a review of the records Respondent did submit and other information provided by him, a DEPS auditor concluded that Respondent failed to file the required tax returns and did not preserve and account for the trust corpus, contrary to *DR* 1–102(A) and *DR* 6–101(A). On June 25, 1982, DEPS filed a complaint against Respondent charging violations of his fiduciary obligations; self-dealing, misappropriation and misuse of trust funds; gross negligence which damaged his client; and engaging in conflict of interest in his fiduciary capacity. Respondent filed an answer. After hearing testimony from Mrs. Kuglan's attorney, the Ethics Committee concluded that Respondent's conduct was unethical and unprofessional. Respondent did not attend that ethics hearing.

### 4. MACOMBER/BOWDITCH

In November 1974, Respondent met with Mrs. Margaret K. Macomber and her daughter, Mary Bowditch. They wanted

Respondent to set up a trust for Mrs. Macomber and handle other legal matters for her. Mrs. Macomber was 74 years old and in failing health; her daughter resided in Great Britain. Mrs. Macomber at some point transfered $25,000 in stock to Respondent as trustee. Her estate at this time was valued at $130,000. When Mrs. Macomber questioned about having a bank as trustee, Respondent replied that the amount was too small for a bank to handle and that he could do a much better job for much less. When Mrs. Macomber moved to Florida in 1976, Mrs. Bowditch had a trust agreement drawn up by a bank which named her and the bank as co-trustees. The amount held by Respondent at that time approximated $130,000. Between November 9, 1974 and April 30, 1976, Respondent, acting on Mrs. Macomber's behalf, allegedly visited 115 nursing homes within New Jersey, in alphabetical and not geographical order. According to Respondent, he compiled a list of the homes and then traveled back and forth across the state visiting and inspecting them. He charged her $49 an hour inclusive of expenses, for about 700 hours of work. Mrs. Macomber was not placed in a nursing home until she moved to Florida and that placement was not the result of Respondent's efforts. Mrs. Bowditch believed her mother never authorized Respondent to visit these nursing homes and to bill her for that service.

Respondent also received from Mrs. Macomber a total of $23,260 in cash. Respondent had given her promissory notes for these funds. One note was dated June 1, 1975, for $13,500 at 7% interest for an eight month term and the other was dated July 15, 1975, for $10,000 at 7% interest for a seven month term. These funds were held by Respondent in his individual name and not in an attorney's trust account. Respondent paid at least two interest payments to Mrs. Macomber after she moved to Florida. He also paid some or all of her moving expenses. Respondent did not submit a bill to Mrs. Macomber for services rendered. He kept the funds and refused for more than two years to account for them when requested by the

appointed Florida trustees. When the Florida bank was not able to collect from Respondent it filed a civil action against him in October 1978. Respondent, without signing any declaration of liability, settled the civil action by paying the trustees $9,000.

After hearing testimony from Mrs. Bowditch, the Ethics Committee concluded Respondent violated *DR* 5-101 by having a dual capacity as a trustee for and debtor of Mrs. Macomber. It also found that he violated *DR* 9-102 and *DR* 5-103.

### 5. RONALD HUBERT MALMENDIER

The District Ethics Committee reserved decision on this complaint because it could not determine whether the appropriate Respondent should be John J. Winberry or John J. Winberry, Jr.

## CONCLUSION AND RECOMMENDATION

██ Upon a review of the full record, the Board is satisfied that Respondent is guilty of unethical conduct by clear and convincing evidence.

██ His management of the Kuglan estate demonstrates a course of self-serving conduct. Having obtained control of a sizeable estate, Respondent utilized the funds for the benefit of personal family interests. Whether decedent understood the ramifications of the investment agreement which he purportedly entered into is not clear. Regardless, it was Respondent's duty as an attorney to document his client's full understanding of the import of the agreement after consultation with independent counsel. *In re Kamp*, 40 *N.J.* 588 (1963). Even assuming that decedent intended to vest in Respondent total estate management, Respondent's failure to file required federal estate returns, failure to account for the use and disposition of assets and failure to keep the heirs advised in any meaningful manner constitutes a total dereliction of his fiduciary obli-

gations. Respondent has acted throughout as though he were the beneficiary, not the agent.

His conduct in all four matters exhibited a pattern of contumacious behavior and delay tactics. Respondent's repeated and flagrant disregard of court orders are echoed throughout these disciplinary proceedings.

Respondent has been the subject of ethics complaints since 1975. A brief review of the history of these cases reveal a continued pattern of delay by Respondent which has thwarted their timely resolution. Formal hearings have been adjourned over ten times for various reasons offered by Respondent.

Respondent's lack of cooperation with the ethics proceedings still continues. His failure to be medically examined and psychiatrically evaluated after he agreed before this Board to undergo these tests on March 21, 1984 is one more example of his distain for the integrity of our profession. Respondent's claim that he did not keep these appointments because he was ill is an all too familiar refrain. Respondent has even failed to fully cooperate with his own attorney whom he retained on June 15, 1984. Respondent did not inform his attorney of all pending ethics matters but only mentioned one particular case. This partial disclosure became the basis for yet another attempt by Respondent to delay the hearings.

██ An attorney has an obligation to be candid and cooperate fully with ethics proceedings. *In re Gavel,* 22 *N.J.* 248, 263 (1956). Respondent's misconduct is not an isolated instance of aberrational behavior. What emerges is a pattern of contumacious conduct, to the courts, the District Ethics Committee and this Board which are arms of the Supreme Court charged with the enforcement of Disciplinary Rules. See *In re Netchert,* 78 *N.J.* 445, 453 (1979). "Something must be done to protect the public against this kind of unprofessionalism." *In re Palmieri,* 75 *N.J.* 488, 489 (1978).

■ An attorney, as an officer of the court, has the duty of good faith and honorable dealing with all judicial tribunals. *In re Turner*, 83 *N.J.* 536, 537, 539 (1980). Respondent's repetitive failure to cooperate with the courts and the ethics bodies evidences a flagrant contempt for our judicial system. This aggravating factor far outweighs any possible mitigation. Respondent's actions call for stern discipline.

Based on the totality of the circumstances, the Board recommends that Respondent be suspended from the practice of law for a period of two years.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.