**In Re Petition of John A. ZBIEGIEN for Review of the State Board of Law Examiners' Decision.**

No. C1–88–509.

Supreme Court of Minnesota.

Dec. 23, 1988.

Charles T. Hvass, Minneapolis, for appellant.

Theodore J. Collins, St. Paul, for respondent.

PER CURIAM.

Petitioner, John A. Zbiegien, appeals from a recommendation of the State Board of Law Examiners that he not be admitted to the Bar of Minnesota because he had failed to prove that he possesses the requisite character and fitness to be so admitted. Our review of the record before us does not persuade us that petitioner must be barred from the practice of law for lack of character. We direct the Board to recommend his admission.

Petitioner was a fourth year student at William Mitchell College of Law when he enrolled in a products liability seminar taught by Professor Michael Steenson. The requirements for the class included a research paper, to be submitted in two drafts. Petitioner chose the topic, "Accident Prevention in Products Liability Litigation."

Petitioner submitted the first draft of his paper on November 11, 1986. The paper was plagiarized in large part from the works of other authors. Nearly all of the first 12 pages were taken verbatim or nearly verbatim from a number of law review articles without proper citation in the endnotes. In addition, some endnotes were taken from other sources in such a way as to give the appearance that they were petitioner's own work. Several other portions of the paper were paraphrased or had words or phrases omitted or substituted for the originals as they appeared in various published sources. Again, no proper citation was given.

The paper, as submitted, was a violation of the academic rules at William Mitchell, as well as basic academic and law school standards.

On December 5, 1986, petitioner kept a scheduled appointment with Professor Steenson to discuss the paper. At that time, Steenson succinctly informed him that the paper was unacceptable because it was plagiarized and that Steenson was recommending he be expelled from William Mitchell. In a subsequent interview with Associate Dean, Matthew Downs, petitioner was informed that he would receive a course grade of "F" and that he would lose credit and tuition for the course but he would be permitted to remain in school.

Petitioner did not deny the plagiarism in his conversation with Dean Downs. When asked for an explanation of the circumstances, he replied that he had been under stress of time pressures, that he had just begun a new job, and that his wife had been injured in an automobile accident, causing additional stress at home. In a letter to petitioner dated four days later, summarizing the conversation, Downs stated: "I appreciated your candor * * *, and I believe that it [the plagiarism] is conduct that will not be repeated."

Petitioner did not appeal the sanction.

On April 15, 1987, petitioner submitted his application for admission to the Minnesota Bar. In response to the question, "Where you ever placed on probation, disciplined, dropped, suspended, or expelled from school, college, university or law school?," Petitioner furnished the following explanation:

Applicant submitted a paper in partial fulfillment of the requirements of a Product Liability Seminar under the direction of Professor Michael Steenson. The paper, a first draft, was submitted on November 11, 1986. Applicant was notified on December 5, 1986, that the paper was unacceptable because of endnoting omissions. It was pointed out to the applicant that no authority had been cited for a lengthly [sic] direct quote and other endnotes were incomplete. Applicant subsequently received an F grade for the class, no other action was taken. Dean of Students, Matthew Downs, found that the paper defects were ones of omission rather than intent. Applicant admits his failure to scrutinize the papers [sic] content due to family problems (Wife totally disabled in auto accident) and new job pressures.

The applicant was unaware of computer problems that was causing text and endnoting problems until a second paper was due in fulfillment of another class on November 26, 1986. On that date, the applicant submitted a letter to that professor, along with a copy of the paper indicating the endnoting problems. The professor allowed the applicant to reprint the paper.

Unable to correct the printing problems, the applicant was forced to purchase a new printer on December 4, 1986. All this occurred prior to applicant's notification of problems with the first paper. If necessary, the applicant will make himself available for a personal interview at the Board's convenience.

Petitioner also disclosed four minor traffic violations and a voluntary petition in bankruptcy "in connection with an agricultural business unable to diversify during the farming crisis" in 1979.[1]

Petitioner was permitted by the Board to take the Minnesota Bar Examination in July 1987, with admission conditioned upon his subsequent proof of the requisite character and fitness. He received a passing score.

On September 11, 1987, petitioner met with the committee on Character and Fitness of the Board of Law Examiners, and on November 20, 1987, a formal hearing was held. Petitioner testified, as did his wife, Judy, and three character witnesses. Professor Steenson and Dean Downs also testified.

At the hearing, petitioner stated that he had not finished high school but had completed his GED while in the army. He had then gone on to night classes at two community colleges in Iowa where he received his bachelor's degree. Both his military record and his previous academic record were unblemished.

Petitioner also testified at length about the problems he had had with his computer,

to which he attributed some of the flaws in the paper. He admitted the extensive plagiarism, however, both in the form of direct quotes not properly indented and footnoted and paraphrased passages not appropriately credited to the original sources.

Both petitioner and his wife described her health problems, which caused her to be confined to the house, under heavy medication, unable to work, and unable to do household chores. She had done the typing of the paper on a computer using unfamiliar software. Neither had actually proofread the paper, although both had apparently glanced through the text. No copy was saved.

The computer problems had apparently been discovered when another paper for another class had been prepared. Petitioner had called the computer software company several times during the preparation of that paper and had finally concluded that the printer would not support the word processing functions of the new software. The purchase of a new printer had solved the problems with indenting and footnoting but not before the second paper had been submitted. Petitioner had reprinted that paper.

These events occurred prior to petitioner's meetings with Steenson and Downs on December 5, but petitioner testified that he did not think of the computer problems in relation to the Steenson paper at that time. He did not review the paper then and indeed, did not see a copy until after his meeting with the Committee on Character and Fitness. He explained that he was ashamed and merely wanted to put the incident behind him.

Family problems contributed to petitioner's dilemma. On the Thursday before the paper was due, petitioner's 16-year-old son had run away from home. He returned on the following Saturday, but his parents had to address his truancy at the school on Monday, and he was suspended from school for three days.

---

1. The bankruptcy is not the subject of this appeal. No student loans were discharged; testimony at the hearing supported petitioner's explanation in the application that the bankruptcy was a result of the farm crisis in Iowa and unavoidable.

The three character witnesses spoke highly of petitioner. Each described him as diligent and very honest. Each felt he was conscientious and able to keep his head, even in turmoil. However, on cross examination, two of the three stated that their otherwise-high opinions of petitioner would be affected, had they been informed of the plagiarism.

In his testimony, Professor Steenson maintained that petitioner's paper was a "crystal clear case of plagiarism" and affirmed that he had recommended that petitioner be expelled from school. Dean Downs, on the other hand, considered the failing of a class a very severe sanction. He stressed that he believed that the conduct would not be repeated, but he stated that petitioner's conduct in the substantial reproduction of many published passages without identification was a reflection of unstated intent to plagiarize. Downs further testified that in the December 5 interview, petitioner had mentioned neither his son's truancy nor the computer problems.

The Board found that not only had petitioner plagiarized a substantial amount of text and footnotes taken verbatim, or nearly verbatim, from various published sources without proper identification but that he had attempted to deceive the Board in his untruthful explanations on his application and in testimony at the hearing. The Board found further that the alleged computer problems did not explain away the plagiarism, and concluded that "by failing to recognize the seriousness and extent of his wrongdoing, Mr. Zbiegien has demonstrated that he lacks the requisite character and fitness to be admitted to the Bar of the State of Minnesota."

Petitioner appeals from that determination.

■ This court has the inherent power to regulate the practice of law. The State has a substantial interest in the qualifications of members of the legal profession. *In re Hansen*, 275 N.W.2d 790, 792–93 (Minn. 1978). The U.S. Supreme Court has stated:

* * * [T]he States have a compelling interest in the practice of professions within their boundaries, and * * * as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners * * *. The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts."

*Id.* (quoting *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)).

■ The Board of Law Examiners is charged with screening candidates for admission to the Bar and reporting the results of their examination, together with a recommendation, to this court. Minn.Stat. § 481.01 (1986). In almost every case, those recommendations stand. However, under Rule VII of the Rules for Admission to the Bar, an applicant may appeal an adverse decision of the Board to this court. In that rare instance, we review the record and the Board's findings independently, for the ultimate determination of admission to the Bar is reserved to this court alone, and we may not delegate that power. Minn. Stat. § 481.01; *see In re Daly*, 291 Minn. 488, 490, 189 N.W.2d 176, 179 (1971). However, we give great weight to the Board's findings in reaching our independent conclusion. *See In Olkon*, 324 N.W. 2d 192, 196 (Minn.1982). We rely on the conscientious, informed and unstinting efforts of the members of the Board and on their opportunity to observe the witnesses. Only with greatest reluctance do we come to a conclusion other than that which the Board recommends. Nonetheless, sometimes, as in this case, we find it necessary to do so.

Rule II.A of the Minnesota Rules of the Supreme Court for Admission to the Bar provides that an applicant must establish good character and fitness to the satisfaction of the Board.

"Good character" is defined as "traits that are relevant to and have a rational connection with the present fitness or capacity of an applicant to practice law." Definition 4, Minn.R.Admis. Bar (1986).

■ The burden of establishing good moral character is on the applicant. *In re Haukebo*, 352 N.W.2d 752, 754 (Minn.1984). The Board has adopted character and fitness standards which list factors to be considered in evaluating an applicant's prior conduct. In assigning weight and significance to the conduct in question, the Board gives consideration to:

the applicant's age at the time of the conduct

the recency of the conduct

the reliability of the information concerning the conduct

the seriousness of the conduct

the factors underlying the conduct

the cumulative effect of conduct or information

the evidence of rehabilitation

the applicant's positive social contributions since the conduct

the applicant's candor in the admissions process

the materiality of any omissions or misrepresentations.

Character and Fitness Standards, adopted by the Board of Law Examiners, Dec. 18, 1987.

In determining whether petitioner should be denied admission to the Bar, we consider first whether a single incident of plagiarism while in law school is sufficient evidence to prove lack of good character and fitness.

■ While generally the Board looks for a pattern of conduct that reflects on an applicant's moral character, a single incident can form the basis for denial of admission to the Bar. *In re Gahan*, 279 N.W.2d 826 (Minn.1979). However, the conduct must reflect on the individual's honesty or regard for the rights of others or for the

laws of the state or nation. *Haukebo*, 352 N.W.2d at 754–55.

Plagiarism, the adoption of the work of others as one's own, does involve an element of deceit, which reflects on an individual's honesty. Not only is plagiarism a violation of William Mitchell's Code of Student Conduct, it is also a violation of academic standards everywhere. *See generally* Comment, *Plagiarism in Legal Scholarship*, 15 U.Tol.L.Rev. 233 (1983).

■ The petitioner clearly plagiarized large sections of his paper, "Accident Prevention in Products Liability Litigation." Of the first 12 pages (out of a total of 30), nearly the entire text is lifted verbatim, or almost verbatim, from a series of law review articles. Footnotes are reproduced without reference to the original source. Had the passages been properly footnoted, the entire first half of the paper would have been one quote after another with little material in between. Even a cursory glance would reveal that the numerous quotes which should have been indented in block-style were improperly referenced. Indeed, that part of the paper was little more than a collage of quotes from other authors.

We do not condone petitioner's act of plagiarism. It is an affront to honest scholars everywhere and to other members of the class whose legitimate pursuits would be weighed against this appropriated material. Petitioner was guilty of this act. We cannot conclude, however, that a single incident of plagiarism while in law school is necessarily sufficient evidence to prove lack of good character and fitness to practice law.

■ We must next consider whether petitioner's subsequent disclosure and explanation of the incident in the Bar application and in testimony before the Board indicated a pattern of attempted continued deception and lack of remorse. The Board found that (1) petitioner failed to acknowledge the seriousness and extent of his wrongdoing; (2) petitioner attempted to de-

ceive the Board in his explanation of the plagiarism incident on his application for admission; and (3) petitioner continued to attempt to deceive the Board at the formal hearing on his character and fitness.

We have held that once a lack of good moral character has been found, an applicant may submit evidence to reasonably explain the behavior or to show reform or rehabilitation. In *Haukebo*, 352 N.W.2d at 756. The burden of proof is still on the applicant. *Id.* at 754.

The plagiarism occurred during petitioner's final year in law school; the currency of the behavior was evident. However, remorse and candor in the application process and testimony before the Board, as well as an explanation of the incident, could supply necessary evidence of reform and rehabilitation.

Our examination of the record before us convinces us that petitioner did express remorse. In the letter written contemporaneous to the incident, Dean Downs stated, "I appreciated your candor." Downs and petitioner alike testified that at their brief conference at the time of the incident, petitioner indicated that he was sorry. His wife described him as visibly shaken. He did not examine the paper after the events of December 1986. He stated that he was ashamed and only wanted to put the incident behind him.

It is true that he attempted to explain away his behavior. Neither the computer problems nor the stress within the family adequately explains or excuses the flaws in the paper, although each may have been a contributing factor.

Petitioner did reveal the incident in his Bar application. Down's December 19, 1986 letter to petitioner stated:

[I]t is my finding that the paper you submitted fails to footnote all articles used and a large section of the paper contains a direct quote from a law review article, but no reference is made to the applicable article as part of that quote. Other parts of the paper reflect para-

phrasing but incomplete citations are given for the original sources. This plagiarism of legal sources is a violation of the William Mitchell Student Code * * * in that you submitted as your own work the work of another.

Petitioner, on his application, stated that Downs had "found that the paper defects were ones of omission rather than intent." The Board concluded that this response was untruthful.

While petitioner's explanation does not use the word "plagiarism," it is also true that Downs' letter indicates that the problems with petitioner's paper were the result of omitted and incomplete citations. The William Mitchell Student Code does not require a finding of intent.

Petitioner did offer to make himself available for a personal interview at the Board's convenience. We think that the disclosure of the incident on the application was sufficient to alert the Board to the need for further investigation.

Omissions on Bar applications have been found to be insufficient grounds for denying admission to the practice of law. *See In re Waters*, 84 Nev. 712, 447 P.2d 661 (1968) (applicant disclosed only one of two law schools he had left; court found the notice requirement met through availability of all law school transcripts and an explanation); *In re G.L.S.*, 292 Md. 378, 439 A.2d 1107, 30 A.L.R. 4th 1000 (1982) (applicant omitted time spent in prison on his list of residences; court found requisite notice, and applicant, having asserted that he had not intended to conceal the arrest and prison sentence, was duly admitted); *Hallinan v. Committee of Bar Examiners, State Bar*, 55 Cal.Rptr. 228, 65 Cal.2d 447, 421 P.2d 76 (1966) (applicant's failure to list arrests held *de minimus* omissions; admitted); *see generally, Admission to Bar—Good Moral Character*, § 23, "Falsehood or omission in bar application," 30 A.L.R. 4th 1020 at 1063.

At the hearing, counsel for the Board dissected the paper line by line and phrase

by phrase. Again and again, petitioner admitted responsibility as he initialled each plagiarized passage. Petitioner also attempted to explain the incident to the Board at the hearing. He cited his wife's health, computer problems, stress in his family. He had not raised all of these explanations during his brief interview with Downs at a time when he was noticeably upset. Yet we do not think the record supports the Board's conclusion that these omissions amounted to petitioner's continued deception of the Board.

We agree with the Board that plagiarism is an onerous act, and there is no dispute that petitioner did indeed plagiarize substantial portions of his paper. However, he disclosed the incident in his application, if not to the satisfaction of the Board, at least to the extent of putting them on notice to investigate further. In his application and subsequent testimony, he did attempt to explain his behavior. Further, he indicated that he was ashamed and that he was very sorry. Dean Downs believed that the plagiarism would not be repeated and elected to impose a sanction consistent with that belief.

It is the view of this court that petitioner's conduct, wrongful though it was, does not demonstrate such lack of character that he must be barred from the practice of law. He has been punished; he is ashamed. He has had his admission delayed for over a year. William Mitchell College of Law elected to give him a second chance. We, too, believe that this conduct will not be repeated. We hold that, under the facts and circumstances of this, case petitioner will not be barred from the practice of law for a single incident of plagiarism while in law school. We therefore direct the Board of Law Examiners to recommend petitioner's admission to the Bar of Minnesota at the earliest possible time.

KELLEY and COYNE, JJ., dissent.

KELLEY, Justice (dissenting):

I respectfully dissent. When this court admits an applicant to the practice of law, it certifies to the public that the applicant has mastered certain minimum standards of professional competence. It also certifies that it knows of no reason why the applicant-admittee does not possess the character which the profession demands of all admitted attorneys in this state. We judge an applicant's character by the standard that it must reflect those traits of integrity, honesty and trustworthiness necessary for a lawyer to possess when he or she represents clients, when dealing with professional peers, and when appearing before the courts. Yet, in this case, notwithstanding that we know that this petitioner has demonstrated a lack of candor, and, indeed, has recently engaged in outright dishonesty by plagiarizing and claiming as his own the intellectual works of others with no attempt at appropriate attribution of source, the majority would conclude, even as it condemns the petitioner's conduct, that he has been "punished" enough by the delay in his admission, is now contrite, and will, if admitted, be trustworthy.

Without doubt the action taken by William Mitchell Law School and the delay caused by these proceedings have resulted in petitioner's admission date being postponed. In that sense it can be said the delay flowing from his plagiarism constitutes "punishment." Denial of his application at this stage in his life does indeed have penal repercussions with which I, no less than the majority, have empathy. However, denial of admission at this time, notwithstanding it bears with it consequences of a penal nature, has not as its purpose punishment but rather protection of the public and the integrity of the legal system. In this case, it seems to me that nothing short of a denial would be consistent with the court's implicit assertion that a grant of admission is equivalent to certification, that so far as we have been able to ascertain, the admittee is honest, trustworthy, and possesses the integrity that the public, the Bar and the courts have a right to expect from an attorney at law. Additionally, in my opinion, it is only by a denial of this petition that this court can send a

clear message to those already admitted to practice and to those aspirants yet in the law schools the seriousness with which this court considers the character qualification.

To meet the requirements of Professor Steenson's Products Liability Seminar at William Mitchell Law School, respondent submitted a first draft of a purported research paper which consisted substantially of materials plagiarized from the published works of other authors. Although nearly one-half of the paper is virtually identical to portions of eight law review articles, there was no citation to those articles nor any attempt at attribution. Footnotes, in like manner, were also plagiarized. Petitioner, although never specifically admitting plagiarism does admit these facts. There can be no doubt these acts constituted "intentional plagiarism." Moreover, it seems clear to me that the modus operandi of the plagiarism belies the contention it resulted from any claimed computer malfunction, as petitioner belatedly asserted. The intent aspect is corroborated by obvious attempts to mask it by omission of an occasional sentence, by changing paragraphing, and by making minor alterations or inserting an occasional alien word in the text of the plagiarized quotation. The plagiarism as well as the attempts to "cover up" clearly violated William Mitchell's academic rules and standards. As the majority indicates, Professor Steenson, the law school teacher, conducting the seminar, viewed the conduct to be so serious that he recommended expulsion from the law school.

At a subsequent meeting with Associate Dean Downs of the law school, while not specifically denying the plagiarism, the petitioner did offer as mitigating excuses pressures at work and his wife's health problems following an automobile accident.[1] Dean Downs concluded that, in fact, petitioner had plagiarized substantial portions of the paper, and so characterized petitioner's action in a letter to petitioner dated December 12, 1986.

Petitioner's verbatim response to Question 13 on the admission application is set out in the majority opinion. The State Board of Law Examiners (Board), composed of both lay and professional members, after a full adversarial type hearing, made unanimous findings that the response to the question was both untruthful and misleading. If I read the opinion correctly, the majority concludes that since the applicant disclosed the incident in the answer, therefore there existed no continuing attempt on the applicant's part to deceive the Board. It appears to reach that conclusion by extracting from a rather lengthy answer the applicant's admission that the paper had "defects" and were found to be "errors of omission rather than intent." I expect the Board, as do I, would appreciate an applicant would try to gloss over and minimize the seriousness of the conduct and present it in the best light possible, but it certainly cannot be unreasonable for the Board to conclude the applicant was perpetrating his deception when he reported falsehoods. Both Professor Steenson and Dean Downs considered the incident to constitute intentional plagiarism and so informed petitioner before or at the time the school's discipline was imposed. The applicant's entire response avoids using or referring to plagiarism. Moreover, a reading of it certainly leaves the writer with the impression that the difficulty involved only one quote along with some footnotes ("no authority had been cited for a lengthy direct quote and other end notes were incomplete"). In fact, the submitted paper consisted of over 50 percent of unattributed quotations from not one, but eight authors. I am unable to hold that, in the light of those facts and the additional fact that not until the time of the hearing before the Board did the petitioner admit to any plagiarism, that the Board's findings of ongoing deception and misleading conduct were unfounded.

---

1. Although petitioner later alleged that there were other mitigating circumstances—to-wit, computer problems and a son's truancy, he did not claim that at the time of his meeting with Dean Downs.

The fundamental rudiment of theft, dishonesty, has received universal disapprobation by all courts empowered to admit or discipline attorneys. This court has said that one who deliberately engages in deception subverts that "loyalty to truth without which he cannot be a lawyer in the real sense of the word." *See, e.g., In re Nilva,* 266 Minn. 576, 583, 123 N.W.2d 803, 809 (1963). We have even disbarred attorneys who have engaged in dishonest conduct, albeit in addition to other serious transgressions. *See, e.g., In re Williams,* 221 Minn. 554, 23 N.W.2d 4 (1946). Plagiarism is defined in Websters Third New International Dictionary 1728 (1976) " * * * to steal or pass off as one's own without crediting the source * * * to commit literary theft; present as new and original an idea * * * derived from an existing source." It is defined in Black's Law Dictionary 1305 (rev. 5th ed. 1979) as "The act of appropriating the literary composition of another, or parts or passages of his writings, or the ideas or language of the same, and passing them off as the product of one's own mind." As one court has pithily observed, when one appropriates without accreditation the original work products of another the act is afforded the colloquial term "chiseling." *See, Oneida, Ltd. v. Nat'l Silver Co.,* 25 N.Y.S.2d 271, 275 (1940).

Honesty is universally recognized as the character trait most fundamental to the practice of law. The American Bar Association, the body that reflects the attitude of the Bar as a whole, recently revised and recommended Rules on Professional Conduct. The court, with minor amendments, adopted those rules to govern the conduct of Minnesota lawyers. Failure by the lawyer to abide by those rules by engaging in dishonest conduct exposes him or her to public discipline or, in extreme instances, disbarment. Proscribed conduct illustrative of the profession's concern with this trait is found for example in Rule 3.3 which provides a lawyer shall not intentionally misrepresent a matter of fact or law to a court; in Rule 4.1 which prohibits a lawyer from knowingly making a false statement of law or fact while representing a client; in Rule 8.1 which forbids an applicant for admission to the Bar from falsely stating a material fact; and in Rule 8.4 which labels as professional misconduct any actions of a lawyer involving dishonesty, fraud, deceit, or misrepresentation. I cite neither the authority or the rules to establish that petitioner was dishonest when he plagiarized articles for his paper; that is overwhelmingly established by the evidence as the majority also concludes as it condemns it. Rather, I cite them to underline the seriousness with which the profession and the courts have deemed intentional conduct involving intentional dishonesty by a member of, or a person seeking admission to, the profession.[2]

The majority opines that the respondent's plagiarism was "not necessarily sufficient evidence to prove lack of good character and fitness to practice law." For two reasons I must disagree. First, that statement seems to shift the burden of proving fitness for admission from the shoulders of the applicant to the Board to prove unfitness—certainly not the case. Secondly, it fails to give deference to the Board's conclusion that in answering Question 13 of the application for admission petitioner "intended to deceive the Board of Law Examiners with respect to plagiarism *and with*

**2.** News reports indicate that a California man was convicted and sentenced for permitting his wife, an attorney admitted to practice law in California, to take the California bar examination for him. She likewise was convicted and sentenced and is facing disbarment proceedings. *See Ethics,* vol. 1, Spring/Summer 1988, pp. 24–25, citing Los Angeles Times, April 27, 1988. Though not specifically involving plagiarism, but certainly involving dishonesty which is the essential component of plagiarism, numerous examples exist where dishonest attorneys have been severely disciplined for similar offenses of altering or submitting false documents. *See In re Rabb,* 83 N.J. 109, 415 A.2d 1168 (1980) (three years suspension for altering medical report); *In re Stump,* 621 P.2d 263 (Alaska 1980) (five years suspension for falsifying documentary evidence in civil suit).

*respect to the college's finding of plagiarism,* further demonstrating his lack of fitness to be admitted to the Bar * * * " and that petitioner's "continuing to deceive the Board regarding the similarities between the paper submitted and the article identified * * * further demonstrates his lack of requisite character and fitness to be admitted to the Bar * * *." It appears to me those conclusions were amply supported by substantial evidence in the record as a whole and, therefore, should be upheld.[3] Apparently as part of his attempt to demonstrate that his attempted cheating by plagiarism constituted an isolated character aberration unlikely to recur, petitioner called three character witnesses, all of whom attested to his good moral character. However, the Board heard each of these witnesses state that they were unaware of the William Mitchell incident, and had they been aware of it, they would not have formed the same favorable opinion.

The facts as found by the Board when combined with the Board's unique opportunity to assess the credibility of the petitioner and his witnesses, in my view, are more than sufficient to sustain the Board's findings and conclusions, which, I would hold, are entitled to deference by this court. Accordingly, in the guise of labeling it "remorse," I decline to substitute my personal empathy for the petitioner. He has undertaken a long struggle to complete arduous educational requirements. However, I find from the record that the ultimate conclusion of the Board that he has not met his burden of proving fitness is supported by substantial evidence.

Though the consequences to petitioner may seem harsh if the Board's recommendation be adopted, such serious consequences are not without precedents. Examples abound where those who have plagiarized, or engaged in substantially similar conduct, have sustained onerous consequences. Young men and women enrolled at the nation's service academies have been deprived of education and careers in the officer corps for cheating; high governmental officials have gone to prison for lying; a president of the country has left office in dishonor as a result of his dishonesty; a newspaper critic of a metropolitan newspaper lost his position for plagiarizing a review; a professor of psychology at Harvard University Medical School resigned after it was revealed he had plagiarized another's work in an article written in a professional journal;[4] and a candidate for the presidency of a university who reportedly had plagiarized a portion of a research paper withdrew his candidacy under pressure. I suggest that these examples reflect societal concerns that people in responsible positions—such as is an attorney at law—be held to a high degree of integrity.

Even though I would deny the petition, I would not foreclose forever, petitioner's admission to the Bar. I would, however, require that he prove that after a reasonable period of time had elapsed he then acknowledged and appreciated the seriousness of his transgression; that his remorse is sincere and that he accepts unconditional and full responsibility for the conduct; and demonstrates that from the experience he has learned to conduct his affairs in a manner that this court can, with confidence, certify to the public that his charac-

---

3. The rules for admission are silent as to weight or deference this court should afford Board findings. Nonetheless, in appeals from referee findings and conclusions in lawyer disciplinary matters (which bear some similarity to this proceeding) we have tested findings to see if supported by substantial evidence, and, if so, affirmed, *In re Schmidt,* 402 N.W.2d 544, 548 (Minn.1987); *In re Getty,* 401 N.W.2d 668, 670 (Minn.1987). Likewise, under the Administrative Procedure Act, Minn.Stat. § 14.69 (1986) agency findings may be set aside only if "unsupported by substantial evidence in view of the entire record submitted." Affirmance of such findings should follow if a reasonable mind might accept as adequate. *See, e.g., Minneapolis Police Dept. v. Minneapolis Comm'n on Civil Rights,* 425 N.W.2d 235, 239 (Minn.1988). The similarity of those types of proceedings to this seemingly suggests a similar review standard should be applicable in this case.

4. St. Paul Pioneer Press & Dispatch, Nov. 29, 1988 at 1A, col. 1.

ter does reflect traits of integrity and trustworthiness.

COYNE, Justice.

I join the dissent of Justice KELLEY.