**In re Petition of James Alex CUNNING-HAM, Jr. for Review of Decision of Board of Law Examiners.**

No. C8–92–1337.

Supreme Court of Minnesota.

June 25, 1993.

Lindquist & Vennum, R. Walter Bachman, Minneapolis, for appellant.

Fabyanske, Svoboda, Westra & Hart, P.A., Gerald R. Svoboda, St. Paul, for respondent.

PER CURIAM.

This is a petition for review by James Cunningham, Jr. from a June 1992 decision of the Minnesota Board of Law Examiners recommending that he be denied admission to the Minnesota bar because of character and fitness deficiencies. We adopt the Board's recommendation and deny the applicant's admission, but with leave for a later reapplication.

Petitioner Cunningham, 29 years old, is a 1989 graduate of the University of Wisconsin School of Law. Under the diploma privilege of that state, he was admitted to the practice of law in Wisconsin without the need to pass a character and fitness evaluation; he is a member in good standing of that bar.

In March 1990 petitioner applied for admission to the Minnesota bar but failed to pass the examination. In January 1991 he applied again, and this time passed. On both occasions petitioner completed and sent to the Board an application which, among other things, asked if he had any unsatisfied judgments against him, if he had any debts over 90 days past due, if he had ever been charged with, arrested, or questioned regarding the violation of any law, and if he had ever been a party to or a witness in any legal proceeding, civil, criminal or administrative. Cunningham answered these questions under oath "no."

Cunningham submitted a satisfactory Professional Responsibility Exam score to the Board in August 1991. Subsequently, in the course of its routine investigation, the Board received a report that on November 23, 1986, in Madison, Wisconsin, petitioner had been arrested on a bench warrant for a Milwaukee County paternity action. By letter to the Board dated October 1, 1991, petitioner apologized for failing to disclose this information in his application; he acknowledged the arrest and the pater-

nity action, and stated, "I was ordered to make payments of $100 monthly during the times I was working; and to report back to the Commissioner upon my securing permanent employment." Petitioner was then asked to explain his failure to disclose the paternity proceedings. By letter dated October 8, he explained that he thought the application question meant being "a party involved in litigating a matter from start to finish," and that he had only appeared before an assistant court commissioner, not a judge, and that he thought the paternity action "was extrajudicial in nature."[1]

Petitioner furnished the Board with a copy of an order of the Wisconsin court dated May 27, 1987, which he had in his possession, entitled "Order Amending Findings and Judgment." This document provided that Cunningham (as respondent in that case) pay $100 a month child support commencing June 1, 1987, and that payments be made to the court. Later, the Board obtained copies of the complete file of the paternity proceedings from the Wisconsin court. The file included a copy of the original paternity judgment dated November 10, 1986, which adjudged Cunningham the father of the child born November 10, 1980, and required him to pay birth expenses and past support of $4,196.17, but (apparently because the father was then a student) postponed repayment until further order of the court. The judgment also imposed certain reporting requirements on him.

After the Board determined not to recommend petitioner for admission to the bar, he requested a hearing, which was held before the Board on April 16, 1992. Petitioner Cunningham appeared personally with counsel and testified. Three witnesses testified to his good character and fitness. Because credibility issues are involved here, it is necessary to set out in some detail the factual record developed at the Board hearing.

---

1. Question III(A)5 of the bar application, which petitioner answered "no," reads:

Have you individually, or as an officer or director of a corporation, or as a member of a partnership, ever been a party to or a witness in any legal proceeding (civil, criminal, administrative, family law, or domestic abuse law)? Attach copies of records relative to the incident(s)?

The suit papers in the paternity action were served on petitioner in December 1983 by leaving a copy at his family's home in Milwaukee while petitioner was away at school in Madison. Petitioner claims he never was given the papers and, consequently, was unaware of the action, of the default hearing held in Milwaukee in May 1985, and of the entry of judgment on November 19, 1986. Four days after entry of the judgment, petitioner was arrested in Madison on the bench warrant.

The 1986 judgment required petitioner to report any changes in employment status or address to the court within 10 days of occurrence. Petitioner testified he did not report because he was unaware of the terms of the judgment until January 1990. The court file shows petitioner appeared in the Milwaukee County Court on November 25, 1986, in response to the arrest and thereafter four times, December 30, 1986, February 6, 1987, May 27, 1987 (at which time the order amending findings was issued), and August 14, 1987 (at which time the court issued a "hold open" order on support payments). From 1982 to 1986, petitioner was an undergraduate student at the University of Wisconsin, and from 1986 to 1989 he attended the university's law school. He has always acknowledged his parenthood and has never contested the paternity judgment. It appears the Milwaukee County Court held support payments in abeyance, except for the summer of 1987 when Cunningham made three $100 payments while holding a summer job. On graduation from law school, petitioner worked for 1 year clerking for a federal bankruptcy judge in Milwaukee. In the summer of 1988, he clerked with a Minneapolis law firm, and in September 1990 he joined the Minneapolis law firm as an associate.

From August 1987 to January 9, 1992, petitioner made no further appearances in the Wisconsin court, nor did he report to the court his clerkship with the federal bankruptcy court or his employment with the Minneapolis law firm or his changes of address. On January 9, 1992, while the Board's investigation was pending, petitioner on his own initiative drove from Minne-apolis to Milwaukee and made an unscheduled "walk-in" appearance in the family court. He submitted to the court commissioner a financial statement showing his gross annual income with the Minneapolis law firm to be $37,000, and also presented a proposed order and stipulation, drawn by him, to pay $200 a month support. The court commissioner's notes indicate the commissioner advised petitioner that the stipulation had not been signed by the mother and would have to be completed, executed, and then mailed to the court. The commissioner's notes further say, "State and Resp Stip to repayment of BE & PS & ct cost at $100/month commencing 2–1–92." At the April Board hearing, petitioner testified that after the January 9 court appearance, he received a signed order to pay $100 a month on arrearages. The court file, however, only indicates that in March the court had prepared and mailed to petitioner an unsigned draft order, reciting that respondent had a gross annual salary of $37,000 and proposing payments of $100 a month commencing February 1, 1992, to repay birth expenses and past support. It appears the court made no attempt at this time to provide for payments on current support because the mother was not on public assistance and, therefore, the existing "hold-open" child support order of August 1987 could not be modified without her consent.

Over the years in question, petitioner made sporadic support payments when employed in a summer job and during his clerkship. In June 1990, he began making regular support payments of $100 a month. He has never made any payments on the $4,196.17 judgment.

In fact, petitioner's annual gross salary at the Minneapolis law firm was not $37,000 as he reported to the court, but $47,000. Petitioner explained he had been confused about the difference between gross and net income, and that he had deducted certain amounts from his overall pay because he thought they were not part of his taxable income. Yet petitioner's legal experience was in the area of creditor-debtor law. In his financial statement, some of

the deductions which petitioner says he took from his $47,000 salary were again taken as deductions from the $37,000 he reported as his "gross" income.

The Board made a number of critical findings. The Board found that petitioner had intentionally failed in his two applications to the Board to disclose the paternity action, the resulting unsatisfied judgment, and his subsequent arrest on a bench warrant. The Board found that petitioner's failure to report to the court his clerkship with the federal bankruptcy court and with the Minneapolis law firm, as well as his failure to report his changes of address, were intentional violations of the court's judgment of November 19, 1986. Petitioner testified that he was unaware of the terms of this judgment until he saw it for the first time at his "walk-in" appearance in the Wisconsin court on January 9, 1992. The Board reasoned, however, based on petitioner's four court appearances relating to his employment, income and support obligations, plus his acknowledged receipt of the amended order of May 27, 1987, plus his initial statement to the Board that he was to report back to the court upon obtaining permanent employment, that petitioner, no later than May 27, 1987, had knowledge of the judgment and its terms.

The Board further found that petitioner's explanations for failing to make payments on support arrearages and for underreporting his gross annual income by $10,000 lacked candor, were unbelievable, and were motivated by an attempt either to avoid or to reduce his support obligations. As previously indicated, petitioner testified he did not disclose the paternity action on his bar applications because he thought it was "ex-

trajudicial." He testified he did not disclose his arrest on the bench warrant because he thought it had been "expunged." The Board unanimously concluded, "Mr. Cunningham's dishonesty with respect to the paternity proceedings and with respect to his financial obligations arising therefrom, renders him unfit for admission to the practice of law in the State of Minnesota." [2]

Some of the background facts of this case are troublesome, and they troubled the Board as well. Petitioner was a 17-year-old high school student when he fathered the child involved here. While he apparently had some contact with the mother after the child's birth, he has never lived with nor been married to the mother. For 3 years after the child's birth, the mother made no attempt to establish paternity or to collect support. The paternity suit papers were served at place of abode but apparently petitioner was not aware of the service. The default judgment was not entered until 1½ years later, but again, apparently petitioner was not aware of this until arrested on the bench warrant in May 1987. Petitioner is now married and has two children.

Petitioner strenuously asserts that he did not violate any court order arising from the January 9, 1992, court hearing. Clearly he did not violate any written order, but it does appear that he understood he was to pay $100 a month on the original judgment beginning February 1, 1992, under his stipulation with the Wisconsin court, yet he chose not to make the payments. Admittedly, the rather informal Wisconsin court proceedings were somewhat confusing. In-

---

2. Following the Board hearing, petitioner submitted documents relating to further developments in the Wisconsin court proceedings. It appears the child's mother rejected the petitioner's $200 a month stipulation, retained counsel, and brought an order to show cause for increased support payments.

On February 23, 1993, petitioner submitted to this court a recent order of the Wisconsin family court dated December 17, 1992, in which the judge finds that petitioner had been discharged from his position with the Minneapolis law firm on August 1, 1992, when Minnesota refused him a license to practice in Minnesota "because the

respondent had future support arrears in Wisconsin." Because this seemed an "unusual basis" for denial of a license, petitioner was asked to produce a copy of the denial decision.

The representation as to the reason for Minnesota's denial of a license was made by petitioner's Wisconsin counsel, who appeared at the court hearing without petitioner. If, in fact, this representation had been made, it would be, of course, a mischaracterization of the reasons for the Board's action. Good faith reasons for not paying support would not reflect adversely on a bar applicant's character.

deed, the affidavit of legal counsel for Wisconsin court services states, "[I]t does not appear that Respondent failed to comply with any existing child support order." But as one of the Board members noted during the hearing, the question for the Board was not one of legal culpability for past conduct but whether petitioner was now "a person who has sufficient respect for the law."

The critical issue, then, was whether the failure to disclose to the Board, the failure to report to the Wisconsin court, and the salary misrepresentation were, as petitioner argues, unintentional and excusable good faith mistakes, or whether they were intentional evasions and indicated a lack of the candor and integrity required of a member of the bar. The Board found the latter was true.

From August 1987 until January 1992, a period of almost 4½ years, petitioner, knowing he was to report to the Wisconsin court, kept the court uninformed of his whereabouts and employment status. For more than 1 year after he became an associate at the Minneapolis law firm, earning $45,000 the first year and $47,000 the second year, petitioner chose to pay only $100 a month for the support of his child. If petitioner had reported his changed employment status to the Wisconsin court, his payments would have increased substantially over the $100 he was voluntarily paying. In two bar applications, petitioner gave false answers under oath. Finally, with the bar investigation under way, petitioner appeared before the Wisconsin court and underreported his gross annual income by $10,000. Petitioner had explanations and excuses for his course of conduct but the Board found them unbelievable.

In *In re Zbiegien*, 433 N.W.2d 871, 874 (Minn.1988), this court said, "[W]e give great weight to the Board's findings in reaching our independent conclusion. * * * Only with greatest reluctance do we come to a conclusion other than that which the Board recommends." The Board fairly and conscientiously reviewed the court records and listened to petitioner's testimony, and its findings and conclusions are supported by the evidence. In *Zbiegien*, we decided that a single instance of student plagiarism, which was disclosed, albeit inadequately, in the bar application, did not demonstrate such lack of character as to bar the applicant from bar admission. In this case, on the other hand, there is a record of deliberate avoidance of obligations to the court extending over a period of years, and culminating in deceitful behavior with respect to two applications to the Board and the income misrepresentation to the Wisconsin court. On this record, there is no assurance that petitioner understands the respect for the truth expected of a lawyer. For these reasons petitioner does not meet our standard of character and fitness.[3]

Dishonesty, whether displayed by a licensed attorney or an applicant to the bar, is of grave concern to this court. Thus, attorneys already admitted to the bar who engage in dishonest acts are often subject to suspension from all aspects of their legal practice—and are required to notify each of their clients of that suspension. The harsh effects of such a sanction on an established practitioner, including loss of income, public reproachment, and even permanent loss of clients, are appropriate in light of the importance of candor and honesty to the practice of law in Minnesota. Similarly, when dishonesty is displayed by a bar applicant at the very threshold to admission—indeed, when it is employed to gain admission, as it was here—it merits serious disciplinary action. Admission to the bar must not be ill-gotten.

When this court denies a petition for lack of good character and fitness, the applicant may not reapply for admission for 3 years following the Board's determination. Rule VIII(B), Rules of the Supreme Court and of

---

3. An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts and others with respect to the professional duties owed to them. A record manifesting a significant deficiency in the honesty, trustworthiness, diligence or reliability of an applicant may constitute a basis for denial of admission.

Character and Fitness Standards, adopted by the Board of Law Examiners, Oct. 31, 1990.

the State Board of Law Examiners for Admission to the Bar, effective July 1, 1988. Here the Board's decision was issued June 30, 1992, so June 1995 would be the soonest petitioner could reapply under Paragraph B of Rule VIII. Paragraph A(2) of the rule further provides, however, that on a petition for review the supreme court "shall * * * make such order as it may in its discretion deem appropriate." Thus the rule recognizes that, with the passage of sufficient time, an applicant may be able to rehabilitate his or her good character and fitness, and again seek admission. *See Zbiegien*, 433 N.W.2d at 880–81 (Kelley, J., dissenting from admitting applicant, but adding, "I would not foreclose forever, petitioner's admission to the Bar."). There needs to be, then, a sense of proportion between the aberrant behavior and the duration of the denial of admission to the bar.

In this case, we are inclined to allow a reapplication for admission to be made within 2 years after the Board's adverse decision, rather than the 3 years contemplated by Rule VIII(B). From our review of the record, we are left with the impression that petitioner's lack of candor and trustworthiness may be amenable to correction. There seems to be no indication of an ingrained character flaw. The mother of petitioner's child and the Wisconsin court were very lenient with petitioner's support obligations, willing to put matters on hold until petitioner finished his schooling and was gainfully employed; and this leniency and informality may have led petitioner to underestimate the seriousness of the situation. In some respects, too, petitioner's conduct appears simply obtuse. For example, petitioner failed to disclose on his application his employment with the Minneapolis law firm, yet it became clear at the hearing that this failure was not intentional. There is reason to believe petitioner may be able to rectify his character deficits and show that he has gained the requisite appreciation and understanding of the qualities of honesty, candor and responsibility required for admission to practice in this state.

Therefore, petitioner's application is denied; provided, however, petitioner may renew his application after June 30, 1994, for the purpose of showing he meets the character and fitness standard. The burden of proof, of course, is on petitioner.

So ordered.

WAHL and GARDEBRING, JJ., concur specially.

PAGE, J., dissents.

WAHL, Justice (concurring specially).

Under Rule II(A)(2), Rules of the Supreme Court for Admission to the Bar, the burden of establishing good character and fitness to the satisfaction of the Board is upon the applicant. Had this court been the finder of fact, we might have credited petitioner's assertions that certain omissions on his bar applications, his failure to report to the Wisconsin Court, and the salary misrepresentation were unintentional and excusable good faith mistakes, but the Board could, and did find, on the record before it, that these actions of petitioner were intentional evasions which indicate a lack of the candor and integrity required of a member of the bar. The case is troubling. As the majority recognizes, petitioner did not violate any written order; indeed, according to legal counsel for Wisconsin court services "[I]t does not appear that Respondent failed to comply with any existing child support order." And, yet, the record shows "deliberate avoidance of obligations to the court extending over a period of years, and culminating in deceitful behavior with respect to two applications to the Board and the income misrepresentation to the Wisconsin court." Because it seems unlikely to me, in light of this devastating experience, that petitioner would ever again handle his obligation to his child or to the Board in this fashion and because it appears that in all other matters he conducts himself with honesty and integrity, I would waive two of the three years he would otherwise be required by Rule VIII(B) to wait before applying for readmission. I would allow petitioner to renew his application after June 30, 1993,

for the purpose of showing he meets the character and fitness standard.

GARDEBRING, Justice (concurring specially).

I join in the Special Concurrence of Justice WAHL.

PAGE, Justice (dissenting).

I respectfully dissent.

At the outset it is important to state that I do not condone, nor should this court tolerate conduct by people wishing to practice law in this state which is dishonest, misleading, and lacking in candor. In fact, our obligation is to protect the public from such behavior. Indeed, in some cases we have not acted as strongly as we should in that regard. However, in determining who shall practice law in this state and the conditions under which they shall be permitted to practice, we must be consistent, and we must be fair. In denying petitioner's admission, we are not being consistent or fair. If petitioner were currently admitted to practice law in Minnesota and was subject to discipline for the same acts for which we now deny him admission, I do not believe that the result would be as harsh as here. Certainly, as the majority says, admission to the bar must not be ill-gotten. However, I believe, based on the facts before the court, that this applicant to the bar should not be subject to a far more harsh sanction than licensed attorneys who have, in addition to breaking the trust of their clients, committed forgery, perjury, or misappropriated client funds.

Petitioner was admitted to practice law in Wisconsin in 1989. After his admission in Wisconsin, petitioner was employed as a law clerk at the Federal Bankruptcy Court in Milwaukee, Wisconsin. In September of 1990, he began working as an associate at the Minneapolis law firm of Rider, Bennett, Egan & Arundel. Petitioner's employment there was terminated following the denial of his application for admission to practice law in Minnesota. During this time, he did not engage in any act meriting professional discipline, and he earned the respect and trust of his colleagues. Indeed, three individuals from the law firm testified in support of petitioner's honesty, including a former managing partner of the firm who stated that he found petitioner to be "very straightforward, very honest, very candid" and that petitioner would "be a strong asset to the Bar." One of those individuals, an attorney at the firm, stated in a supplemental character and fitness report to the National Conference of Bar Examiners that, "In my opinion, Mr. Cunningham's ethical standards * * * outshine all of those in his law school class at this firm."

Judging from this court's recent actions, petitioner's acts would not merit such severe discipline if he was already a member of our bar. In *In re Brenner*, 498 N.W.2d 256 (Minn.1993), we suspended for a mere 45 days an attorney whose acts were much more egregious than those of petitioner. Brenner committed numerous trust account violations, including the misuse, misappropriation, and commingling of funds; failed to maintain the trust account books and records required by Lawyers Professional Responsibility Board Amended Opinion No. 9 for a period of several years; falsely certified to this court on his attorney registration fee statements that he properly maintained such books and records; and engaged in an ongoing pattern of neglect and noncommunication with regard to three separate client matters entrusted to him. At the time of Brenner's suspension, his disciplinary history included admonitions in January 1985 and March 1988, as well as an August 1990 public reprimand and probation for neglect of client matters, submission of a false affidavit to the court, and failure to communicate with clients. Brenner was still on probation when the allegations resulting in his suspension arose.

In *In re Boyd*, 430 N.W.2d 663 (Minn. 1988), we held that conduct which included preparing a false deed and causing it to be forged, notarized and filed, and issuing a false title opinion based on that deed warranted only a six-month suspension for a lawyer who had received three previous disciplinary admonitions. *Id.*

In *In re Danna,* 403 N.W.2d 239 (Minn. 1987), we suspended for only 90 days a lawyer who had, without the client's knowledge or consent, prepared and submitted to the court as evidence false affidavits, and who attempted to cover up this conduct by giving perjured testimony.

In contrast to *Boyd, Danna,* and *Brenner,* the conduct which underlies the allegations against petitioner involved his personal affairs. He did not misuse client funds, engage in any misconduct in representing a client, or engage in any conduct of a criminal nature. If the appropriate sanctions for these individuals were 6 month, 90 day and 45 day suspensions, respectively, I fail to see how we can say that petitioner is unfit to practice law in Minnesota. I would grant petitioner's application for admission to practice law in Minnesota subject to two years of supervised probation.