IN THE MATTER OF JOHN P. BREEN, AN
ATTORNEY AT LAW.

January 9, 1989.

## ORDER

This matter coming before the Court on an order to show cause why JOHN P. BREEN of PLAINFIELD should not be disbarred or otherwise disciplined, and said JOHN P. BREEN having failed to appear before this Court on the return date of said order to show cause, and good cause appearing;

It is ORDERED that the report of the Disciplinary Review Board recommending that respondent be disbarred is hereby adopted; and it is

ORDERED that JOHN P. BREEN be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is

ORDERED that JOHN P. BREEN be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that respondent comply with Administrative Guideline 23 of the Office of Attorney Ethics dealing with disbarred attorneys.

## APPENDIX

### Decision and Recommendation of the Disciplinary Review Board

This matter is before the Board based on 13 presentments filed by the District XII (Union County) Ethics Committee and one presentment filed by the District V-C (Essex County) Ethics Committee.

*The Haupt Matter*

This matter arose out of a Michigan judgment obtained by Marv Haupt ("grievant") against respondent. By way of background, on November 5, 1976, grievant filed an action in Michigan based upon a financing transaction with a certain corporation, whereby the latter was to obtain financing for a coal mining operation in West Virginia. Grievant paid the corporation the sum of $10,890.00, to be held in escrow by respondent, the corporation's New Jersey attorney. When the corporation failed to secure the financing, grievant requested the return of the monies in escrow. They were not returned. Grievant then filed an action against the corporation and respondent for restitution and damages based on fraud, conspiracy and other related grounds.

Upon being served with the summons and complaint, respondent forwarded them to the client corporation without further action because he "knew they had nothing to do with [me]." Respondent did not file an answer, thereby causing a default to be entered against him. Respondent then moved to set aside the default, but failed to appear on the return date of the motion. On May 18, 1977, a default judgment was entered in the Michigan action against respondent in the amount of $6,943,102.70, on proofs by expert testimony as to grievant's damages, including interests and costs. The basis for the judgment was fraud, conspiracy to defraud, material misrepresentation and breach of trust agreement.

' Respondent next filed a motion to vacate the default judgment and to dismiss the matter for lack of jurisdiction. On October 6, 1977, the court granted the motion to set aside the default judgment and scheduled the matter for trial, subject to respondent's payment of $4,000.00 in attorney's fees which, the court found, resulted from respondent's "negligence and obtuseness in the case." Respondent never paid the counsel fees.

On November 9, 1977, the default judgment was reinstated and grievant sought to enforce the Michigan judgment in New Jersey. By order dated October 10, 1980, the New Jersey court ruled that the Michigan judgment was entitled to full faith and credit and entered a judgment against respondent in the amount of $6,943,102.70, together with interest from May 18, 1977. Respondent did not appeal said order.

On August 14, 1980, or less than two months before the entry of the New Jersey order recognizing the Michigan judgment, four mortgages were recorded against his Plainfield house. The first mortgage was given to Dorothy Hammer, believed to be respondent's female companion; the second was given to Donald Frandsen, an old friend of respondent's; the third was given to Theresa and Dominick Giordano, respondent's sister and brother-in-law; and the fourth was given to respondent's brother, Thomas Breen, Jr. Furthermore, a title search re-

vealed a deed from respondent to Dorothy Hammer, dated March 10, 1980 but recorded on September 29, 1980, only 21 days before the New Jersey judgment was docketed.

On December 4, 1984, the court ordered respondent to attend a supplementary proceeding and to produce all relevant documentation. Respondent did not appear.

On February 1, 1985, the court ordered respondent to appear before it on March 1, 1985, to show cause why he should not be held in contempt. Again, respondent did not appear. Whereupon the court signed a warrant for respondent's arrest.

Respondent was arrested on June 17, 1985. He was ordered to testify at the supplementary proceeding and to furnish all requested documents to grievant's attorney. Although he appeared, respondent failed to bring any documents. He testified that he had no office records, other than notes in his checkbook. He was unable to produce proof of any consideration for the mortgages and the deed. At a prior deposition, his sister and brother-in-law testified that they had no knowledge of a mortgage in their name against respondent's house.

A further hearing was scheduled for July 2, 1985. Once again, respondent did not appear. Although further warrants for his arrest have been signed, it appears that respondent has successfully evaded them.

The district ethics committee hearing was held on May 22, 1986. Respondent did not appear. The panel report found that respondent had violated *R.P.C.* 8.4 through acts of "misconduct of the most egregious nature," by committing fraud and conspiring to commit fraud against grievant in the Michigan matter; by failing to return grievant's deposit; by failing to respond to court orders and to appear at supplementary proceedings; by being arrested for breach of court orders; by failing to provide documents, pursuant to court orders; by illegally placing mortgages against his home in order to de-

fraud a judgment creditor; and by illegally transferring his house, for no consideration, to defraud a judgment creditor.[1]

The committee submitted a unanimous presentment and recommended that, on the Haupt matter alone, respondent be disbarred.

*The Berger Matter*

Complainant, Daniel E. Berger, is an attorney-at-law of the State of New Jersey. On April 3, 1985, complainant represented his father's corporation, Lakechef, Inc. ("Lakechef"), as landlord, in a tenancy matter to evict respondent's client, Main Answer, Inc. ("Main Answer"), for failure to pay rent.

At the tenancy proceeding, respondent made false statements to the court concerning the amount of rent due by Main Answer. Specifically, respondent produced an agreement between Lakechef and Main Answer which purported to set off certain credits against the rent. The agreement, which was unsigned by Lakechef, was false. It was prepared by respondent or by someone at his direction, with his consent or approval. With the knowledge that it was false, respondent introduced it into evidence at the tenancy proceeding. Nevertheless, the court granted a judgment of eviction on that date.

On the next day, April 4, 1985, respondent filed a bankruptcy petition in behalf of Main Answer, thereby causing an automatic stay of the eviction. On May 22, 1985, complainant filed a motion in the bankruptcy court seeking a lift of the automatic stay, on the ground that the eviction had been ordered prior to the filing of the bankruptcy petition. The motion sought, also, to compel Main Answer to pay rent during the pendency of the bankruptcy.

---

[1] At the committee hearing, reference was made to a possible ethical infraction arising out of respondent's appearance in the *Berger* matter at a time when he was ineligible to practice law for failure to pay the Client Security Fund. The committee concluded that the record before it did not support a finding of an ethical violation. For similar reasons, the Board is unable to reach a conclusion in this regard.

On the return date of the motion, respondent misrepresented to the bankruptcy judge that the rent due was $275.00 per month when, in truth, Main Answer had previously made payments in the amount of $500.00 per month.[2] Respondent misrepresented, also, that Main Answer was entitled to certain credits.

In view of the conflicting statements concerning the amount of rent, the bankruptcy judge adjourned the matter in order to conduct a hearing on that issue. He ordered, however, that Main Answer continue to pay the least amount of rent due, $275.00 per month.

On July 13, 1985, a new bankruptcy judge heard the matter.[3] Once again, respondent made serious misrepresentations to the court. Specifically, he falsely stated that the prior bankruptcy judge had ruled on the matter and had denied the motion to lift the automatic stay. The new judge, however, had reviewed the record prior to the hearing. In spite of respondent's misrepresentation, the judge lifted the automatic stay and granted complainant's motion to have Main Answer evicted.

On August 6, 1987, respondent filed with the county clerk a false document purporting to be a Notice to Stay Execution of Removal Pending Appeal. Said document was designed to mislead the authorities and to prevent them from carrying out the eviction.

Nevertheless, the eviction began at 11:00 a.m. on August 21, 1984. At noon, respondent telephoned the clerk's and the constable's offices to advise them that he had obtained an order from a federal court staying the eviction. By the time the clerk's office contacted the constable, however, the eviction had been completed.

---

[2] One of the $500.00 checks had been returned for insufficient funds. Lakechef then filed a complaint in the municipal court charging Main Answer with issuing a bad check. The complaint was ultimately dismissed.

[3] The prior bankruptcy judge had retired by that date.

Respondent had, in fact, obtained a two-day stay of the eviction, at which time he misrepresented to the court that he had given notice of his application to the complainant, his adversary in the matter. The stay, however, was not granted until 4:30 p.m., hours after respondent telephoned the clerk's and constable's offices.[4]

Thereafter, respondent filed a lawsuit in behalf of Main Answer against Lakechef for malicious prosecution in violation of civil rights, stemming from the municipal court complaint on the $500.00 bad check. Lakechef was represented by attorneys for its insurance carrier. Although aware that Lakechef was represented by counsel, respondent communicated directly with principals of Lakechef by sending letters and serving interrogatories on Lakechef.

The hearing before the district ethics committee took place on January 14, 1986. Respondent did not appear. Following the conclusion of the hearing, the committee found that respondent had been guilty of unethical conduct, in violation of *R.P.C.* 1.2(a), *R.P.C.* 3.2, *R.P.C.* 3.3(a), *R.P.C.* 3.4, *R.P.C.* 4.1, *R.P.C.* 4.2 and *R.P.C.* 8.4. Specifically, the committee concluded that respondent had made serious misrepresentations to three judges; had filed a fraudulent notice of appeal; had introduced false documents into evidence and made fraudulent statements on behalf of his client; had failed to make reasonable efforts to treat the court and other attorneys with reasonable courtesy and consideration; had knowingly made false statements of material fact or law and offered evidence which he knew to be false; had falsified evidence; had made false statements of material facts to third persons; had communicated directly with an adverse party represented by counsel; and had committed

---

[4]Complainant and the county officials were subsequently sued by Main Answer, this time represented by different counsel, for wrongful eviction. Coincidentally, the same federal judge heard the matter. The suit against complainant was dismissed on motion for summary judgment.

numerous acts of misconduct. The committee recommended that a presentment be brought against respondent.

*The Patria and Burrell Matter*

In February 1984, Daniel Patria, Sr. and Darlene Burrell ("grievants"), uncle and niece, formed a corporation ("Darlynn"), the purpose of which was to operate a telephone answering service. Grievants were officers of Darlynn. Darlynn had signed an agreement with Atlantic Telephone Service, Inc. ("Atlantic") to install and lease an answering service system.

In March 1984, Darlynn entered into an oral agreement with Main Answer, Inc. ("Main Answer"), whereby the latter assumed all of Darlynn's liabilities and obligations, including those under the lease agreement with Atlantic. Grievants remained with Darlynn under an employment contract. The preparation of the written agreement was assigned to respondent, who was Main Answer's in-house attorney. Grievants were unrepresented by legal counsel.

In January 1984, Atlantic informed grievants that the lease was considered terminated for failure to make payments. Main Answer had not made the lease payments, as required by its oral agreement with Darlynn. Neither had respondent prepared the written agreement.

In October 1984, Atlantic served grievants with a summons and complaint, with Atlantic demanding payment and replevin of the equipment. Grievant then contacted respondent, who acknowledged that it was Main Answer's responsibility to make the lease payments and informed grievants that he would assume their representation in the litigation. Accordingly, grievants turned over to respondent the summons and complaint, relying on his promise to undertake their representation.

In January 1985, grievants discovered that respondent had failed to answer the complaint, thereby causing a default judgment to be entered against them, together with a writ of replevin. Grievants immediately contacted respondent, who acknowledged his failure to file an answer and assured griev-

ants that he would forthwith file a motion to vacate the default judgment against them.

In spite of his promise, respondent neglected to file the motion, as a result of which Atlantic recovered monies and equipment from grievants. Ultimately, grievants were forced to appear *pro se* before the court, in order to set aside the default judgment.

The district ethics committee hearing was held on July 16, 1986. Respondent did not appear. At the conclusion of the hearing, the committee found that, by representing Darlynn and Main Answer, respondent had created a definite conflict of interest, without any disclosure to grievants. The committee found, also, that he had acted against grievants' interests by favoring Main Answer and neglecting to act diligently and competently on grievants' behalf. In addition, the committee found that respondent had failed to communicate with grievants about the status of the litigation, all to grievants' detriment. The committee concluded that respondent had violated *R.P.C.* 1.1(a), *R.P.C.* 1.2(a), *R.P.C.* 1.3, *R.P.C.* 1.4, *R.P.C.* 1.7(a), *R.P.C.* 3.2 and *R.P.C.* 8.4. The panel report revealed the committee's grave concern with respondent's ethical infractions. It stated "[i]t should be noted that the committee [is] extremely disturbed by the actions of Mr. Breen in this particular matter and that the miscondut in this particular case constituted more than negligence but gross misconduct and intentional wrongdoing on behalf of his clients. Essentially his actions constituted a fraud upon two innocent parties, namely Patria and Burrell." The committee recommended that a presentment be brought against respondent.

*The Doley Matter*

In November 1977, Carolyn Doley, now known as Carolyn Lombardi ("grievant"), engaged respondent to institute a divorce action against her then husband, who had been respondent's client from 1971 to 1975. In 1975 or 1976, respondent had also represented grievant in a matrimonial matter against

her first husband. In spite of the fact that respondent had represented both parties on prior occasions, he undertook to represent them in their divorce settlement. At no time did respondent advise grievant of a potential or actual conflict of interest arising out of the dual representation.

Ultimately, grievant retained new counsel. Respondent refused to release her share of the net proceeds of the sale of the marital home, which proceeds he was holding in escrow, demanding that grievant pay him the sum of $2,500.00 from the escrowed proceeds. Grievant then instituted an action against respondent for the release of the escrow funds.

The matter was decided in favor of grievant. The court ruled that respondent had committed a tortious act of conversion by asserting control of escrowed funds belonging to grievant. Eventually, respondent released the funds to grievant, albeit with considerable delay.

The hearing before the district ethics committee took place on May 14, 1985. At the end of grievant's testimony, respondent requested an adjournment to afford him the opportunity to obtain legal representation. He advised the committee that he would have to make an application for the appointment of an attorney, in view of his indigent status. The committee granted an adjournment. No application, however, was ever made. The committee made numerous attempts to contact respondent by telephone and by letters, advising him that, unless an attorney were appointed, the matter would proceed without him. Respondent never replied. At the conclusion of the second hearing, the committee found that respondent had violated DR 2-106, DR 9-101, DR 7-104 and DR 4-101. Specifically, the committee concluded that respondent had been guilty of overreaching; had communicated with a party of adverse interest who was not represented by counsel; had breached the confidentiality of an attorney/client relationship; and had failed to avoid the appearance of impropriety. The committee recommended that respondent be publicly reprimanded.

## MATTERS INVOLVING PATTERN OF NEGLECT

### 1. *The Van Arsdale Matter*

In November 1980, Barbara Van Arsdale ("grievant") contacted respondent for legal representation in connection with the institution of a personal injury action in her behalf. She met with respondent, for the first time, in December 1980. At that time, respondent advised her to obtain any medical records concerning her injuries. She did so. At a subsequent meeting with respondent, in July 1981, grievant submitted all medical records, bills and a narrative of her injuries, as instructed by respondent.

During the remainder of 1981 and the early part of 1982, grievant contacted respondent at least 20 times in order to obtain information about the status of her matter. On two occasions only did respondent return her telephone calls.

In August 1982, respondent informed grievant that he had received an offer from the insurance company in the amount of $25,000.00. Said offer, actually made in March of 1982 and rejected by respondent, was never communicated at the time to grievant, in writing or orally.

On October 29, 1982, two days before the statute of limitations was to run, respondent filed a complaint. It was not until sometime in 1983 that he forwarded to grievant a copy of the complaint, which was not stamped.

In June 1984, the matter was scheduled to be considered by an early settlement panel. Upon contacting the clerk's office, grievant was advised that the matter was about to be dismissed as a result of respondent's failure to provide proof of service on certain defendants. When grievant contacted respondent, he told her that the clerk was a "liar."

In November 1984, grievant demanded that respondent immediately turn the file over to her so that she could obtain new counsel. Respondent complied, but several weeks later. Numerous important original documents were missing from the

file. Grievant's new counsel made numerous attempts to obtain the remainder of the file from respondent, all to no avail. New counsel was forced to obtain a court order requiring respondent to release the entire file. Respondent ignored the court order. In late 1985, new counsel settled the matter for $34,875.00.

The district ethics committee hearing was held on December 13, 1985. Respondent failed to appear. The committee concluded that respondent had violated *DR* 7–101(A)(1), (2), (3), *DR* 7–101(B)(1), *DR* 1–102(A)(1), (5), (6), *DR* 9–102(B)(1), (3), (4), *DR* 7–102(A)(8) and superseding *R.P.C.* 1.2., *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4. Specifically, the committee found that respondent had failed to seek the lawful objectives of the client through reasonable, available means; had failed to act with due diligence and to maintain property and records received from the client; had failed to turn over the file when requested; had failed to carry out his contract of employment, to the client's prejudice; had failed to keep the client reasonably informed as to significant matters that affected her case; had engaged in conduct prejudicial to the administration of justice; and had been guilty of illegal conduct. The committee recommended that a presentment be brought against respondent.

## 2. *The Gross Matter*

In May 1982, Herbert Gross ("grievant") consulted with respondent about the institution of an employment-related action in his behalf. At respondent's request, grievant paid him a retainer of $750.00. Between June 1982 and December 1983, grievant telephoned respondent 50 to 60 times in an attempt to obtain information about the status of his matter. On the very few occasions that respondent returned his calls, grievant was informed that the matter was not progressing because respondent was "busy renovating his house," "in court," or "working with diamond merchants in Michigan."

In December 1983, when grievant consulted with another attorney, he was advised that the statute of limitations had run. It appears that the cause of action consisted of libel, slander or defamation, which carries a one-year statute of limitations.[5]

A hearing was held before the ethics committee on December 13, 1985. Respondent failed to appear. The committee concluded that respondent had failed to represent his client zealously; had failed to act with due diligence, thereby causing the statute of limitations to run; had failed to communicate with the client; had failed to discuss the matter with the client to enable him to make an informed decision regarding representation by other counsel; and had been guilty of misconduct. Accordingly, the Committee found that respondent had violated DR 7-101(A)(1), (2), and (3), DR 9-102(B)(4), DR 1-102(A)(1), (5), (6) and superseding R.P.C. 1.2(a), R.P.C. 1.3, R.P.C. 1.4 and R.P.C. 8.4. The committee recommended that a presentment be brought against respondent.

### 3. The Stevens Matter

In February 1984, Wanda M. Stevens ("grievant") retained respondent to represent a friend who was incarcerated at that time. The representation concerned certain unpaid sales taxes by a candy store owned by grievant's friend.

Shortly thereafter, grievant paid respondent a cash retainer of $600.00 and submitted the essential documents requested by respondent to start the litigation. She did not hear from respondent again, in spite of her numerous attempts to reach him.

In October 1984, grievant retained new counsel, who requested that respondent turn over the file to him. One year later, in

---

[5]Grievant also consulted respondent with respect to a lawsuit against the union of which grievant was a member. It was grievant's belief that various members of the union were misappropriating funds. The committee dismissed this charge against respondent on the basis of insufficient evidence to support a finding of unethical conduct.

October 1985, respondent still had not released the file. New counsel was then forced to file an order to show cause, which was granted. Respondent ignored the court order, thereby precluding grievant from pursuing the matter and from complying with the state tax reporting services.

At the conclusion of the district ethics committee hearing, which respondent did not attend, the committee found that respondent had violated *DR* 7–101(A)(1), (2), (3), *DR* 1–102(A)(1), (6), *DR* 7–102(A)(8) and superseding R.P.C. 1.2(a), *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4. Specifically, the committee concluded that respondent had failed to communicate with the client, the client's new counsel and the court; had failed to file a tax return, as instructed; had failed to act with reasonable diligence and promptness in representing the client; had failed to respond to the client's reasonable requests for information; had failed to release the file, as ordered by the court; had failed to explain the matter to the client to enable him to make an informed decision; and had been guilty of misconduct. The committee recommended that a presentment be brought against respondent.

### 4. *The Griffin Matter*

In June 1983, Oren Griffin ("grievant") consulted with respondent about representation in a divorce matter filed by his wife. Respondent scheduled a meeting with grievant at Howard Johnson's restaurant, at which time he asked for a $600.00 retainer. No written agreement, however, was prepared or signed.

Grievant indicated to respondent that he was in need of support from his wife because he was a full-time student. He instructed respondent to file a counterclaim seeking support and also alleging desertion on the part of his wife. Respondent neglected to file the counterclaim.

From the period June 1983 to February 1984, respondent communicated very infrequently with grievant, in spite of the

latter's numerous attempts to contact him by leaving messages on a recording machine. On those infrequent occasions when respondent returned the calls, he assured grievant that the matter was proceeding "just fine." Between February 1984 and September 1984, grievant was able to speak to respondent on several occasions and, in fact, met with him personally, but always at some restaurant; never at respondent's office, which is located in his Plainfield home. On those occasions, respondent would advise grievant that the case was progressing "just fine."

From September 1984 through March 1985, grievant was unable to reach respondent. Eventually, in March 1985, respondent informed grievant that the divorce had been granted. He never sent grievant a copy of the final judgment of divorce, however.

Once again, respondent failed to appear at the committee hearing, which was held on January 14, 1986. The panel report concluded that all respondent had done in the matter was to collect the $600.00 retainer. He did not file any papers in grievant's behalf, did not communicate with grievant and did not forward him copies of any documents. The committee found that respondent had failed to pursue the client's lawful objectives; had failed to act with reasonable diligence and promptness, thus causing a judgment of divorce to be granted by default; had failed to take any necessary action in the matter; had failed to communicate with the client; had misrepresented the status of the matter to the client; and had been guilty of misconduct. The committee concluded that respondent had violated *DR* 7-101(A)(1), (2), (3), *DR* 1-102(A)(1), (5), (6), *DR* 7-102(A)(8) and superseding *R.P.C.* 1.2(a), *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4. The committee recommended that a presentment be brought against respondent.

### 5. *The Skalski Matter*

In August 1983, Joseph Skalski ("grievant") was seriously injured in a motorcycle accident. On the advice of a friend,

grievant contacted respondent in September 1983, at which time respondent informed him that his fee would be one-third of any recovery. Respondent did not prepare a written retainer agreement.

At the initial meeting, grievant submitted to respondent all necessary medical bills and records to enable him to file suit. Because grievant was unable to return to work, he requested that respondent apply for P.I.P. benefits in his behalf. In fact, the insurance company who represented grievant did pay over to respondent the sum of $17,000.00 for medical bills incurred by grievant. Respondent, however, never sent it to grievant or paid any medical or hospital bills. Ultimately, grievant's new counsel was able to obtain the $17,000.00 and repay the various providers.

During the period September 1983 to May 1984, grievant became extremely anxious. He was still not receiving P.I.P. benefits. Every two or three days, he attempted to reach respondent. During all of 1984, respondent offered various excuses to grievant as to why he was not receiving P.I.P. benefits.

In December 1984, grievant retained new counsel to start the litigation and to take the necessary steps to pay his medical and hospital expenses. Respondent refused to return the file, in spite of numerous written requests from grievant and his new counsel. As a result, new counsel was forced to reconstruct the files in order to prosecute the tort claim. In January 1986, the suit was settled for $90,000.00.

At the conclusion of the district ethics committee hearing, which respondent did not attend, the committee found that respondent had violated *DR* 7–101(A)(1), (2), and (3), *DR* 1–102(A)(1), (5), and (6), *DR* 7–102(A)(8), and superseding *R.P.C.* 1.2(a), *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4. Specifically, the committee concluded that respondent had failed to carry out his contract of employment; had failed to act with due diligence; had ignored the client's requests for information; had misrepre-

sented the status of the matter; had failed to explain the matter to the client to allow him to make an informed decision; had failed to prepare a written retainer agreement; and had been guilty of misconduct. Accordingly, the committee recommended that a presentment be brought against respondent.

## 6. The Rich Matter

In October 1984, Marion Nicholas Rich ("grievant") retained respondent to apply for the attachment of her ex-husband's pension funds to ensure the payment of alimony. For approximately four to six months, grievant telephoned respondent on a regular basis, most of the time reaching an answering machine. Eventually, respondent appeared at grievant's home on a Sunday evening, at which time he instructed her to sign a "legal document which was to be filed with the court." No retainer agreement or fees were ever discussed. Grievant testified that she and respondent had become friends and that, in 1981, she lent him the sum of $3,000.00. It was her belief that any fee due and owing to respondent would be deducted from said loan.

In April 1985, grievant received a telephone call from the probation department advising her that the file would be closed as a result of her ex-husband's retirement from his employment. Following numerous attempts by grievant to contact respondent, in May 1985 he advised her that an order for the wage execution had been signed and forwarded to the probation department.

In August 1985, grievant received a document from the probation department, informing her that the wage execution was no longer enforceable. Whereupon grievant contacted respondent and requested that he file an application with the court seeking a modification of the order and the attachment of the pension fund. Respondent failed to appear at the hearing or otherwise pursue the matter in grievant's behalf.

In September 1985, grievant tried to contact respondent numerous times, leaving messages on his answering machine.

At the court's suggestion, she retained new counsel. He ignored her requests that the file be returned to her.

Additionally, in 1983, grievant instructed respondent to modify her will to make it self-proving. Respondent neither prepared a new will nor returned the old will to grievant.

The hearing before the district ethics committee was held on January 14, 1986. Respondent failed to appear. The committee concluded that respondent had violated *DR* 6–101(A)(3), *DR* 7–101(A) and superseding *R.P.C.* 1.3, *R.P.C.* 1.1(a), *R.P.C.* 1.4 and *R.P.C.* 8.4. Specifically, respondent had failed to abide by the client's decision concerning the representation of the matter; had failed to attach her ex-husband's pension funds and to revise her will; had failed to act with due diligence and competence; had failed to keep the client informed about the status of the matter; had misrepresented the status of the matter; and had been guilty of misconduct. The committee recommended that a presentment be brought against respondent.

## 7. *The Lawson Matter*

In April 1981, respondent represented Rose Lawson ("grievant") in a divorce action. Pursuant to the final judgment of divorce, grievant's ex-husband was to make alimony payments of $50 per week, said payments to be made through respondent. Between 1981 and October 1985, grievant received the alimony checks from respondent, although not in a timely fashion. Commencing in October 1985 and thereafter through November and December 1985, the payments were never forwarded to grievant, although received by respondent. Starting in January 1986, respondent, or someone at his direction, returned the checks to grievant's ex-husband, who voided them and began to pay grievant directly. Grievant testified that she made repeated attempts to contact respondent, all to no avail. In addition, she appeared at respondent's house and left several messages which remained unanswered.

Respondent did not appear at the committee hearing, which was held on June 17, 1986. The committee found that respondent had violated *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4.[6] Specifically, the committee concluded that respondent had failed to act with due diligence in forwarding the checks to the client; had failed to communicate with the client; and had been guilty of misconduct. The committee recommended that a presentment be brought against respondent.

### 8. *The Gosen Matter*

The 1980, Rita Gosen ("grievant") paid a $600.00 retainer to respondent to attempt to recover monies in connection with a real estate transaction, a promissory note and the repossession of an automobile. Grievant and respondent met at the Howard Johnson's restaurant, at which time he assured her that he would forthwith pursue all three matters. No written retainer agreement was prepared or signed.

After the initial meeting, grievant met respondent at different places, including Howard Johnson's and Burger King, in order to discuss the progress of the matters. In addition, she made repeated phone calls to his office, invariably reaching an answering machine. Respondent never returned grievant's calls.

In November 1985, grievant wrote a letter to respondent, requesting that he return all her documents or, in the alternative, forward them to her new attorney. Respondent refused to do so and failed to take any action in grievant's behalf.

At the conclusion of the district ethics committee hearing, which was held on June 17, 1986, and which respondent did not attend, the committee found that respondent had violated *R.P.*

---

[6]Respondent's conduct was also in violation of *DR* 7-101(A)(2) and (3) and *DR* 1-102(A)(1), (6).

*C.* 1.2(a), *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4.[7] Specifically, the committee concluded that respondent had failed to abide by the client's decisions or objectives; had failed to act with due diligence; had failed to communicate with the client and to keep her reasonably informed about the status of the matter; and had been guilty of misconduct. The committee recommended that a presentment be brought against respondent.

### 9. *The Nowakowski, Monahan and Caulfield Matter*

On September 20, 1980, Matthew S. Nowakowski, Eugene Monahan and Eugene Caulfield ("grievants") retained respondent to represent them in a labor matter. In August 1985, respondent filed an action on grievants' behalf in federal court. On numerous subsequent occasions grievants attempted to contact respondent by telephone in order to request information about the status of the action. Respondent did not return any of grievants' telephone calls.

In January 1986, one of the grievants directly inquired of the court on the status of the matter. He was advised that it had been dismissed as a result of respondent's failure to serve the summons and complaint upon the defendant.

Numerous subsequent telephone calls to respondent remained ignored. Respondent also failed to appear at two scheduled meetings with grievants.

On June 17, 1986, the district ethics committee held a hearing, which respondent did not attend. The committee concluded that respondent had violated *R.P.C.* 1.3, *R.P.C.* 1.4 and *R.P.C.* 8.4, by failing to act with due diligence in representing the clients; by failing to communicate with the clients; and by being guilty of misconduct. The committee recommended that a presentment be brought against respondent.

---

[7] Respondent's conduct was also in violation of *DR* 7–101(A)(1), (2) and (3) and *DR* 1–102(A)(6).

On October 15, 1985, amended on June 12, 1986, a formal complaint was filed by the District XII Ethics Committee, charging respondent with violations of *DR* 6–101(A)(3) and *R.P.C.* 1.1(b), the disciplinary rules dealing with a pattern of neglect. Respondent did not file an answer. A formal hearing was held on June 17, 1986. Respondent did not appear. At the conclusion of the hearing, the committee found that respondent's conduct had been clearly unprofessional and unethical and that, based on the findings of twelve separate cases, respondent had established a pattern of neglect and conduct unbecoming of an attorney, thereby violating *DR* 6–101(A)(3) and *R.P.C.* 1.1(b).

The committee found further that respondent's actions exceeded mere negligence. It concluded that defendant had "systematically devastated the rights of clients, willfully misrepresented facts to numerous judicial tribunals and Courts, and disgraced the legal profession." The committee's final conclusion was summarized in the panel report:

> The respondent has refused to cooperate with the Courts of this State and this committee in assisting them or his clients. While the committee is unsure of what motivated the respondent in his behavior, the committee is convinced beyond a reasonable doubt that the respondent John Breen is totally unfit to practice law in this State. Therefore, this committee recommends that the respondent be permanently barred from the practice of law. Further, the committee recommends that the Office of Attorney Ethics be empowered with the authority to seize all books, records and files of John Breen, and to appoint a trustee to review same and to contact all clients to effect an orderly transfer of these records and files to clients.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board finds that the conclusions of the committees are fully supported by clear and convincing evidence. The Board, however, disagrees with the committee's recommendation, in the Doley matter, that respondent be publicly reprimanded. Standing alone, that ethical infraction might very well merit the recommended discipline. The totality of the transgressions, however, calls for the imposition of more severe sanctions.

■ With regard to the Haupt matter, the Board finds that the record fully supports a finding of ethical transgressions of the most egregious nature. Respondent, or someone at his direction or with his knowledge and approval, fraudulently prepared, executed and recorded four mortgages against his house in an attempt to defraud a judgment creditor, the grievant herein. The mortgages were false and for no consideration. In fact, in at least one instance, the mortgagees had no knowledge of the mortgage. Respondent's sister and brother-in-law testified at their deposition that they were unaware of the mortgage to them and that respondent did not owe them any money.

Similarly, the three other mortgages were fraudulent. The mortgagees were respondent's female companion, an old friend, and his brother. When deposed on April 22, 1985, respondent testified that he and his wife were divorced in 1975 and that, in order to buy her share of the marital home, he had borrowed funds from Dorothy Hammer.[8] This is in direct conflict with the statements made at his November 2, 1984 deposition, when he testified that Ms. Hammer had tendered the loan to him in cash payments over a period of time. Respondent was unable to show any records whatsoever substantiating said loans, including the dates and amounts thereof. He testified that the loans were designed for his "living expenses."

Significantly, the mortgages were prepared after the Michigan judgment was reinstated and prior to the New Jersey court's letter opinion of June 1980. Six weeks later, on August 14, 1980, the mortgages were recorded.

Even more significantly, during the period of time that elapsed between the letter opinion and the New Jersey order granting full faith and credit to the Michigan judgment, *i.e.,*

---

[8]Although respondent alleged that the loan from Dorothy Hammer was made in 1975, the mortgage to her was not prepared until four years later, December 1979.

June 30, 1980, and October 20, 1980, a deed was recorded conveying title to respondent's house to Dorothy Hammer. Although the deed was dated March 20, 1980, it was not recorded until September 29, 1980, 11 days before the order was signed and 21 days before the New Jersey judgment was docketed.

Respondent was unable to recall whether he or someone else had prepared the mortgages and the deed. The conclusion is inescapable that respondent, first, illegally encumbered his house and then transferred title to his female companion, thus divesting himself of any ownership for the purpose of making himself judgment-proof.

His conduct involved dishonesty, fraud, deceit and misrepresentation. *See In re Bricker*, 90 *N.J.* 6 (1982) (where attorney obtained title to land through fraud and deception and committed two acts of false swearing; convictions for conspiracy to obstruct justice, for the use of a corporation to commit fraud and for two instances of false swearing merited disbarment). See also *In re Brinkmann*, 67 *N.J.* 385 (1975) (where attorney who applied for two mortgage loans in the name of his brother-in-law and the latter's wife, forged signatures on title instruments, signed false jurats, and recorded the documents, was disbarred) and *In re Pennica*, 36 *N.J.* 401 (1962) (where attorney's knowledge and approval of forgery of signature on loan documents and payment of money to obtain exculpatory affidavit warranted disbarment).

Respondent's outrageous conduct was not confined to his attempt to defraud a judgment creditor. In the supplementary proceedings which followed, he failed to appear at the hearing; was held in contempt of court; was arrested pursuant to a warrant; was ordered to testify and produce documents; failed to bring any of the documents, as ordered by the court; failed to appear at a subsequent hearing; and caused subsequent warrants to be issued for his arrest.

Respondent consciously perverted the administration of justice by displaying a blatant disregard for orders of the court, of which he was an officer. Respondent's misdeeds are the antithesis of an attorney's obligation to uphold and honor the law. *In re Bricker*, 90 *N.J.* 6, 11 (1982); *In re Schleimer*, 78 *N.J.* 317, 319 (1978). *In re Brinkman, supra*, 67 *N.J.* 385, 386 (1975).

The Board concludes that respondent's conduct was egregious and in violation of *DR* 1-102(A)(1), (3), (4), (5), and (6), *DR* 7-102(A)(8), and superseding *R.P.C.* 8.4(a), (b), (c), (d).[9]

█ With respect to the Berger matter, after its own independent canvass of the record, the Board finds that the evidence clearly and convincingly shows that respondent committed grave ethical transgressions.

Respondent committed fraud upon the court when he represented, at the tenancy hearing, that an agreement existed between Lakechef and Main Answer. In furtherance of his oral misrepresentation, respondent produced an unsigned agreement, which he or his client, with his knowledge and approval, had prepared. The agreement was false.

Additionally, respondent misrepresented the same facts to the first bankruptcy judge and subsequently attempted to deceive the bankruptcy judge who presided at the later hearing. He also filed a false pleading with the county clerk, namely a fraudulent notice of appeal. He misrepresented that he had obtained an order staying the eviction and that he had provided his adversary, the complainant herein, with notice of his application to the federal court. Lastly, he communicated directly with Lakechef, with the knowledge that it was represented by counsel. *See In re Reiss*, 101 *N.J.* 475, 492 (1986).

---

[9]The Rules of Professional Conduct replaced the Disciplinary Rules effective September 1984. Respondent's actions occurred both before and after that date. Hence, both the Disciplinary Rules and the Rules of Professional Conduct apply.

The Board concludes that respondent's conduct was grossly unethical and in violation of *R.P.C.* 1.2(d), (e), *R.P.C.* 3.3(a)(1), (2), (4), and (5), *R.P.C.* 3.3(c), (d), *R.P.C.* 3.4(b), *R.P.C.* 4.2 and *R.P.C.* 8.4(a), (b), (c).

■ In the Patria and Burrell matter, after careful review of the record, the Board finds that the committee properly concluded that respondent's conduct was grossly unethical.

Respondent, as Main Answer's in-house counsel, was responsible for the preparation of the written document embodying the terms of the verbal agreement reached between grievant and Main Answer. Grievants, who were unrepresented, trusted respondent to formalize the terms of the agreement diligently and competently. Respondent, however, neglected to prepare the written agreement. Accordingly, when respondent's client, Main Answer, breached its obligation to make lease payments to Atlantic, as provided by the terms of the oral agreement with Darlynn, Atlantic sought relief from the latter, the party with whom it had contracted. Hence the lawsuit against grievants.[10]

Grievants testified that, three days after being served with the summons and complaint, they met with respondent at the Lobster Shanty in Toms River. After reviewing the summons and complaint, respondent assured them that it was Main Answer's responsibility to make the payments and informed them that he would take appropriate action by answering "the summons and complaint and mak(ing) a motion or whatever legal steps would be necessary to have the summons and complaint rewritten" [T1 15–17 to 19].[11] Grievants were left, thus, with the distinct impression that the lawsuit against them was a mistake and that, as is expected of a responsible attorney, respondent would remedy the situation. Although grievants did not make any payment for legal services, it was

---

[10]Although the record is silent in this regard, it appears that grievants were personally responsible for the lease payments to Atlantic.

[11]T1 denotes the transcript of the hearing on June 17, 1986.

reasonable to believe that respondent would act as their attorney and, as such, protect their interests. Much to their dismay, however, respondent allowed a default judgment to be entered against them by failing to file an answer in the matter.

After several consultations with respondent, grievants once again were assured that respondent would represent them diligently by filing a motion to vacate the default judgment. When he did not, grievants had the judgment vacated by appearing *pro se*. At all relevant times, respondent was Main Answer's attorney.

Had respondent's misconduct been confined to dual representation and neglect, the discipline imposed might not be more severe than a public reprimand or a short-term suspension. *See Matter of Reiss*, 101 *N.J.* 475 (1986); *In re Palmieri*, 75 *N.J.* 488 (1978); *In re Rigg*, 57 *N.J.* 288 (1970); *In re Kamp*, 40 *N.J.* 588 (1963); *In re Lanza*, 24 *N.J.* 191 (1957).

The Board finds, however, that respondent's misconduct was nothing short of unconscionable. It went beyond the instances of conflict of interest and neglect which have been the subject of review by the Board and the Supreme Court. It was tainted with overreaching and fraud. Respondent knew that grievants, who were relatively unsophisticated, had no independent legal advice and relied on his acknowledgment that Main Answer, not grievants, was responsible for the payments. For who better than Main Answer's own counsel to concede that Main Answer had full responsibility for the obligations under the lease agreement with Atlantic?

Moreover, they placed complete reliance on respondent's assurance that he would act as their own attorney in the litigation with Atlantic. Not once did respondent disclose to grievants the serious conflict of interest which he consciously created. Not once did he inform grievants about the actual danger involved in his dual role in the matter.

The conclusion is unavoidable that respondent, from the outset, unscrupulously led grievants to believe that he would

protect their interests, all the while conscious that, if no action were taken in their behalf, his other client, Main Answer, would benefit therefrom and, thus, escape liability. The Board concurs with the committee's insightful conclusion that respondent deviously embarked on a predetermined course of action designed to commit a fraud upon two trusting innocent parties, the grievants herein.

■ With respect to the Doley matter, the Board concludes that respondent violated *DR* 9–102(B)(4) when he refused to promptly deliver to the client the funds to which she was entitled, namely her share of the proceeds of sale of the marital home. That respondent ultimately released the funds to her, pursuant to court order, does not exonerate his conduct.

■ The Board finds, also, that respondent violated *DR* 5–105 by representing both grievant and her husband in the divorce matter. *See Advisory Committee on Professional Ethics Opinion No. 216*, 94 *N.J.L.J.* 677 (1971). *R.* 1:19–6.

■ With regard to the matters evidencing a pattern of neglect, the Board is satisfied that each instance of ethical violation is amply supported by the record. The Board is satisfied, also, that respondent's actions, taken together, exhibit a pattern of neglect. In the nine relevant cases, the instances of misconduct are similar. Respondent deliberately failed to take appropriate action to institute suit and to protect his clients' interests. In each case, respondent undertook to represent the grievants after an initial meeting, demanded a payment of a retainer fee, failed to carry out his contracts of employment, and misrepresented the status of the various actions. These serious ethical transgressions cannot be condoned. *See In re Netchert*, 78 *N.J.* 445 (1979) (where pattern of neglect in 4 separate cases and contumacious failure to cooperate with the ethics proceedings merited disbarment). *See also In re Goldstein*, 97 *N.J.* 545 (1984) (where pattern of neglect clearly emerged from 11 instances of misconduct; coupled with attorney's violation of agreement to limit his practice to criminal matters, misconduct warranted disbarment).

Here, in 12 cases respondent ignored his clients' legitimate request for information about the status of their matters. An attorney's failure to communicate with his clients diminishes the confidence reposed by the public on members of the bar. *Matter of Stein*, 97 *N.J.* 550, 563 (1984). The financial and emotional hardship which respondent deliberately inflicted upon his clients cannot be forgiven. *Matter of Dailey*, 87 *N.J.* 583, 594 (1981). In addition, the record discloses no redress to grievants.

The Board is particularly disturbed by respondent's flagrant, contumacious disregard for the solemnity of the ethics process. In 13 of the 14 matters presently under review, respondent failed to file an answer. Although provided with proper notice, respondent failed to appear at seven of the eight hearings which required extensive preparation by the members of the ethics committees who investigated these matters.[12]

■ When an attorney shows disrespect to an ethics committee, he shows disrespect to the New Jersey Supreme Court inasmuch as the committee is an arm of that Court. *In re Grinchis*, 75 *N.J.* 495, 496 (1978). What emerges in this shocking state of affairs is a pattern of contumacious disdain for the courts, the district ethics committees and this Board. The Board finds that respondent violated *DR* 1–102(A)(5) and superseding *R.P.C.* 8.1(b), by his obstreperous disregard for the ethics process.

The Board noted that respondent has been suspended since February 4, 1986, and until further order of the Court, as a result of his egregious conduct in numerous complaints that

---

[12]The Board wishes to extend its appreciation to the members of the district ethics committees who handled the within matters, particularly to Douglas W. Hansen, Esq., Chair of the District XII Ethics Committee, for their contribution to the ethics process, as shown by their countless hours of preparation that these matters required and by their demonstrated commitment to the legal profession and the judicial system.

had to be investigated. Based on the foregoing and on the record before it, the Board concludes that respondent has consciously forfeited his privilege to practice law.

It is well-settled that membership in the profession is a privilege burdened with conditions. Some of the basic conditions are good moral character, a capacity for fidelity to the interest of the clients and the fairness and candor in dealings with the courts. Those conditions are not only prerequisite for admission to the bar, they are equally essential afterward. Whenever they are broken, the privilege is lost. *In re Pennica*, 36 *N.J.* 401, 433–434 (1962).

Respondent's deceit and dishonesty did not consist of an aberrational act, but a continuing, ongoing, consciously planned course of conduct, which is shocking to the minds of decent individuals and tarnishes the public image of the honorable members of the legal profession.

As Justice Brennan observed in *In re Herr*, 22 *N.J.* 276, 300 (1956), "(t)here is no profession, save perhaps the ministry, in which the highest morality is more necessary than that of the law." By his numerous acts of misconduct, respondent exhibited conscious, willful, callous disregard for the truth and for his duty of good faith and honorable dealing with his opponent and the judicial tribunals. Such conduct diminishes public confidence in the legal profession and goes "to the heart of every attorney's obligation to uphold and honor the law." *In re Schleimer*, 78 *N.J.* 317, 319, (1978) (where an attorney with 40 years of unblemished legal service received a one-year suspension for one instance of false swearing at his deposition).

Respondent's conduct has poisoned the well of justice. It was so immoral that it destroyed any expectation that he can ever again abide by the high standards required of the profession. Accordingly, the Board must recommend that respondent be disbarred. One member did not participate.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.